Miriam A. COLEMAN, Plaintiff,

v.

Blanche NEWBORN, Defendant.

C.A. No. 2354–VCL.

Court of Chancery of Delaware.

Submitted: Aug. 22, 2007.
Decided: Nov. 27, 2007.

Kenneth J. Nachbar, Esquire, Amaryah Kishpaugh, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Eliza M. Hirst, Esquire, Community Legal Aid Society, Inc., Wilmington, Delaware, Attorneys for the Plaintiff.

Kathryn J. Laffey, Esquire, Kelleher & Laffey, Wilmington, Delaware, Attorney for the Defendant.

## OPINION

LAMB, Vice Chancellor.

This is an action to rescind a deed conveying an elderly and disabled person's home (her only substantial asset) to her sister who, at the time of the transfer, was acting as the elderly person's attorney-in-fact. Following trial, the court concludes that, although the power of attorney was not used to effect the gratuitous transfer and although there is no clear evidence that the sister exerted undue influence in connection with the transfer, equity nevertheless requires that the deed be set aside to protect the interests of the plaintiff.

## I.

The plaintiff, Miriam Coleman, is 71 years old and currently resides in the Delaware Psychiatric Center ("DPC") in New Castle, Delaware. The defendant, Blanche Newborn, is Coleman's half sister and is 67 years old.

On November 29, 2005, Coleman signed a quitclaim deed gifting her house, her only substantial asset, to Newborn.[1] Shortly thereafter, Coleman began to ask Newborn to convey the property back to her, and Newborn refused. Coleman filed this complaint on August 17, 2006. Newborn answered on February 13, 2007. After discovery and pretrial briefing, a one-day trial was held on August 22, 2007. At the end of trial, the parties were given an opportunity for post-trial briefing, but they

---

1. The home has a value of approximately $150,000 and is encumbered by a home equity loan of approximately $16,000.

declined. Thus, this opinion is based on the pretrial briefing and the trial record.

At trial, the court heard testimony from Coleman and Newborn. The two other testifying witnesses were Kate G. Shumaker, Esquire, the attorney who prepared the deed transferring the property, and MaryAnn Guggenberger, the director of social services at HCR Manor Care. Many of the facts in the case are undisputed. The only significant area of uncertainty concerns the reasons behind the property transfer. Coleman insisted that Newborn exerted emotional duress upon her, threatening to stop caring for and visiting her if she did not transfer the house. Coleman also testified that Newborn promised to use the proceeds from a planned sale of the house to buy an apartment for her adjacent to Newborn's apartment. Newborn testified that the house was simply a gift and adamantly denied any promise to sell the house for Coleman's benefit or to purchase an apartment for Coleman near her own. As will be discussed below, neither party's testimony was wholly credible on this point, and the circumstances surrounding the transfer suggest a different truth.

## II.

Despite having the same biological mother, Coleman and Newborn had little contact in the early years of their childhood. Coleman lived with her grandparents and Newborn lived with her mother. This changed when Coleman, at age 15, returned to live with Newborn and their mother. The two sisters continued to live together for a little over three years, and during that time they became close. Shortly after turning 18, Coleman married Virgil A. Coleman. Newborn was Coleman's maid of honor, and she and Coleman continued to maintain a close relationship for some years after the marriage. Eventually, the demands in their personal lives caused the two sisters to have less contact. Coleman remained married and raised five children.[2] Newborn married a number of times, raised a daughter, and lived out of state for many years.

In 1964, Coleman and her husband purchased a home at 113 Edjil Drive, Newark, Delaware. The Colemans lived in this home together until Virgil died in 1990. After Virgil's death, Coleman continued to reside there, living on Social Security and Virgil's pension from General Motors Corp. Since the death of her husband, Coleman has been largely estranged from her children. Coleman was close with her daughter, Linda, for a brief time, but their relationship deteriorated when Linda moved to Texas in 1996. Three of Coleman's children lived close by, but none of them showed any interest in maintaining a relationship with their mother.[3]

Soon after Linda moved to Texas, Newborn returned to Delaware and re-established her relationship with Coleman.[4] Newborn had also been widowed and she provided Coleman with much needed emotional support. In addition, Coleman required an increasing amount of help to manage living alone, and looked to Newborn for assistance, including getting groceries, prescriptions, and other necessities.

2. The names of Coleman's five children are Steven, Susan, John, Linda, and Clark.

3. These three children were Steven, Susan, and Clark. At trial, Newborn stated that Coleman would try to contact her children in Delaware, but they would refuse to speak to her.

4. Newborn had been living primarily in Florida from the late 1980s to 1996. Coleman occasionally saw her there when visiting their mother who lived nearby.

Coleman, upset over her husband's death and the lack of a relationship with any of her children, was in need of the companionship she shared with Newborn. It is not overstating it to say that Newborn was Coleman's only close friend.

During the late 1990s and the following years, Coleman's physical condition, and to a lesser extent her mental stability, steadily worsened. At the time of trial, the parties stipulated that Coleman is legally blind in one eye, has diabetes, a thyroid disorder, a heart condition, degenerative arthritis, and suffers from depression. Since Coleman was often in and out of hospitals and nursing facilities, Newborn became instrumental in returning Coleman to her home and assisting with the accompanying transition. This drew Newborn and Coleman even closer and made Coleman increasingly dependent on Newborn. Newborn was the only regular source of emotional support and the only family member fully involved in Coleman's life.

In 2002, Coleman granted her daughter-in-law, Claire, a durable power of attorney, but revoked it after only a few months. Coleman did not relate the full story of this incident, but Newborn testified that Coleman was upset because Claire used the power of attorney to place Coleman in a nursing home and put the Edjil Drive house on the market. According to Newborn, Claire also allowed family members to remove personal property from the house. When Coleman discovered what Claire was doing, she revoked the power of attorney and asked Newborn to have the locks on the house changed to prevent Claire from re-entering. Some months later, Coleman gave Newborn a power of attorney. This solidified the confidential relationship between the two sisters.

Notwithstanding her frequent hospital stays, Coleman continued to live in her house by herself, with the help of Newborn and paid aides. The only extended period of time she spent away from home was when she went to live with her daughter, Linda, in North Carolina in September of 2004. That was not a successful move. Indeed, Linda and her husband forced Coleman to leave in January of 2005. This incident appears to have ended Coleman's relationship with Linda.

Newborn organized and paid for Coleman's transportation home from North Carolina. Newborn also resumed providing Coleman with indispensable assistance. Over the following months, Coleman's condition quickly deteriorated to the point where she was incapable of living alone. Due to Coleman's obesity and immobility, Newborn was unable to fulfill Coleman's increasing physical demands. In July of 2005, Coleman entered the Hillside Heights care facility to try to improve her strength. The following month, Coleman fell, injuring herself, leading to several short hospital stays, before she entered Hockessin Hills nursing home in September of 2005. Hockessin Hills soon had trouble collecting on Coleman's medical bills and arranged with the Social Security Administration to divert Coleman's monthly check to satisfy her account. This was done without the knowledge or consent of either Coleman or Newborn, and, at trial, both Coleman and Newborn recounted the frustration they felt upon learning that this could be done without notice. Coleman remained at Hockessin Hills until she entered Manor Care on November 4, 2005.

When Coleman first entered Hillside Heights, Newborn set up a post office box and had all the mail sent to Edjil Drive forwarded to it. Newborn also exercised virtually exclusive control over Coleman's financial affairs and became actively involved in Coleman's assisted living arrangements. In Coleman's application to Manor Care, on which Newborn was desig-

nated as the responsible party, the Edjil Drive property is not listed as an asset. While she denies having any involvement in completing that application, Newborn does concede to being solely responsible for securing Coleman's placement after Manor Care.

Beginning in October, Newborn applied to have Coleman admitted to the government subsidized assisted living program at Luther Towers in Wilmington. She visited Luther Towers several times, prepared the application, and submitted it on Coleman's behalf. As later explained, it is obvious that Newborn did not list the Edjil Drive property as Coleman's asset on that application either.

Also in the month of October, Coleman contacted the UAW Legal Services Plans to secure a quitclaim deed transferring her house to Newborn. The UAW assigned Shumaker to assist Coleman. Coleman testified that she had used this legal services organization before and made contact in October 2005 because Newborn was exerting emotional pressure on her, threatening to abandon her unless she signed over the house. In an effort to buttress this testimony, Coleman also stated that over the next month or so she repeatedly put Shumaker off, asking her to delay preparing the deed. Coleman's testimony was directly contradicted by Shumaker, who stated that Coleman called her office repeatedly, spoke with Shumaker at least four times and, on each occasion, pressed Shumaker to prepare the deed quickly. Having observed both witnesses at trial, and considering the other evidence, the court concludes that Coleman did not testify truthfully on this point.

Shumaker testified that during several phone calls with Coleman before the execution of the deed, she explained the consequences of executing a quitclaim deed in favor of Newborn. Shumaker also raised the possibility of retaining a life estate, but Coleman was not interested in this option. Finally, Shumaker prepared two deeds and took them to Coleman at Manor Care on November 29, 2005. One deed gave Newborn the interest in the house in fee simple, and the other retained a life estate for Coleman. After meeting with Shumaker, Coleman decided to transfer the house in fee simple to Newborn. Notably, Newborn did not participate in any of these contacts and had no involvement in the execution of the deed. While it is clear that Shumaker regarded her professional relationship with Coleman to be limited strictly to the preparation of the deed, and that she did not thoroughly investigate Coleman's capacity or motivation, the court finds her testimony to be entirely credible.

Newborn denies that she pressured or threatened Coleman in any way. She claims that Coleman gave her the house as a gift, to do with as she pleased, without any conditions attached. She also testified that Coleman remains liable to pay off an equity line of credit, even though it is secured by a mortgage on the house. In fact, in the months following the transfer, Newborn, acting as Coleman's attorney-in-fact, continued to pay this debt out of Coleman's income. When asked whether she thought it was in Coleman's best interests to transfer the house to her, Newborn stated that Coleman feared the house would be taken to pay for her medical care and did not want this to happen. After being pressed further on the question, Newborn responded evasively that Coleman wanted to make the transfer. Newborn also acknowledged that she did not speak to Coleman about the financial ramifications of the transfer to her. For example, she never talked to Coleman about the possibility of selling the house and investing the assets for Coleman's own benefit.

From this, it is clear that Newborn's testimony was motivated largely by her self-interest. While Newborn was not caught in any outright lies, as was Coleman, it was apparent that she was not speaking the whole truth.

Weighing the evidence and the parties' lack of credibility, the court is led to conclude that the transfer of the property was prompted by the sisters' realization, after Hockessin Hills unilaterally diverted Coleman's monthly Social Security check, that Coleman's assets could be taken from her involuntarily to pay for her medical care. In other words, the court rejects Coleman's testimony that Newborn coerced her into making the transfer. Similarly, the court rejects Newborn's testimony that the transfer was meant purely as a gift. Instead, it appears from the evidence that the transfer was meant to hide Coleman's most valuable asset and to qualify her for admission to Luther Towers on a subsidized basis.

The circumstances relating to Coleman's admission and stay at Manor Care support this conclusion. The trial record strongly suggests that Manor Care had some involvement in the property transfer in an apparent effort to get Coleman's bill paid. Three facts support this conclusion. First, despite the fact that the Manor Care admission form did not list the Edjil Drive house, a Manor Care business administrator, Frank DiMarinis, must have become aware of the existence of the house since he signed the November 29, 2005 quitclaim deed as a witness. Second, according to Newborn's testimony, given only after Guggenberger was on the stand, in the weeks following the execution of the deed, DiMarinis repeatedly telephoned Newborn demanding payment of Manor Care's bill, going so far as to ask someone from Delaware Adult Protective Services ("APS") to contact Newborn and question her about Coleman. When Newborn explained to the APS agent that DiMarinis was only interested in getting Manor Care's relatively new and small bill paid, the agent responded that APS was not a collection agency and that DiMarinis had "just shot himself in the leg with me." Third, according to Guggenberger, Coleman told her in December 2005 or January 2006 that it was DiMarinis, not Newborn, who forced Coleman to sign her house over to Newborn. In the end, Manor Care filed suit in the Court of Common Pleas against Newborn and Coleman on March 31, 2006.[5] The core of Manor Care's complaint alleges that Coleman improperly transferred the house, making DiMarinis's participation in the transfer more perplexing.

The communications with Luther Towers around the time of the transfer also suggest Coleman's and Newborn's intention to protect Coleman's house from her future creditors. A few days after Coleman executed the deed, Luther Towers confirmed receipt of Coleman's application for government subsidized assisted living. Several weeks later, Luther Towers acknowledged that Coleman would be admitted on February 1, 2006, at the monthly rate of $315. Based on Guggenberger's and Newborn's trial testimony and this small monthly rent, the court easily infers that Coleman's application (prepared by Newborn) did not disclose the Edjil Drive property or the deed to Newborn. Undoubtedly, Coleman only qualified for such a highly subsidized rate because she reported having no significant assets besides her pension and Social Security income. If she had disclosed her ownership of the house, it certainly would have triggered a higher rate and, if she had disclosed the transfer, she would have likely been dis-

5. *Manor Care v. Coleman*, C.A. No.2006-04- 180 (Del.Com.Pl. Dec. 5, 2006).

qualified from government subsidized care. It is also noteworthy that, for some time after the property transfer, Coleman and Newborn remained on relatively good terms. Newborn continued to visit Coleman through January 2006.

On January 31, 2006, the day before she was scheduled to move to Luther Towers, Coleman was found unconscious at Manor Care and rushed to Wilmington Hospital, where she remained for about six weeks. It was during this time that Coleman's son, Clark, learned of the property transfer and re-entered Coleman's life. Clark filed for guardianship on February 10, 2006. Only after Clark re-emerged did Coleman refuse to return Newborn's calls and decline to see Newborn.

It appears from the trial testimony that Clark's influence, not the property transfer, caused the rift between Coleman and Newborn. Coleman stated at trial that she would still bequeath the house to Newborn and both parties indicated an interest in renewing their friendship. Moreover, Coleman did not revoke Newborn's power of attorney until April 6, 2006. By this time, Coleman had been committed to the DPC and declared incompetent. Coleman was still living at the DPC at the time of trial.

After the transfer, Newborn took minimal steps to maintain the property. She also never moved into the house. Instead, she continues to live with her daughter in a condominium at Rockford Park.

**6.** The other claims for accounting for income and personal property were abandoned at trial. Those claims will be dismissed with prejudice. At trial, Coleman conceded that her deposition testimony stated she did not believe Newborn took any personal property, and, thus, the claim for accounting of personal property was unfounded. Coleman also rested her case without meaningfully ad-

## III.

The complaint originally contained three counts. However, the only claim remaining is for rescission of the deed.[6] The claim for rescission is based on several distinct arguments. Foremost, Coleman argues that Newborn carries the burden of proof based on her role as the attorney-in-fact or, alternatively, due to her close personal relationship with Coleman. According to Coleman, that relationship imposes on Newborn a fiduciary's obligation to demonstrate the fairness of the property transfer. Coleman claims that Newborn cannot meet this burden because Coleman only transferred the deed based on Newborn's assurances that the proceeds of the intended sale of the house would be used to purchase another home closer to Newborn. Relying on the same factual assertions, Coleman also contends that the transfer should be set aside because it was fraudulently induced. Finally, Coleman contends that Newborn was unjustly enriched by the transfer.

Newborn responds that, since Coleman initiated and effectuated the transfer of the house, there is no self-dealing and no breach of a fiduciary duty. In support of her position, Newborn points to the independent and competent legal advice that Coleman had before executing the deed. Newborn denies threatening Coleman or making any promises regarding the house and, apart from acting as Coleman's attorney-in-fact to perform distinct functions, denies that she stood in a broad fiduciary relationship with Coleman.

dressing her accounting for income claim. Moreover, Coleman offered virtually no documentation indicating any impropriety by Newborn. Since Coleman's chief concern was her continued payments on the home equity line after the transfer, this issue will resolve itself, in light of this court's ruling in her favor on the claim for rescission.

## IV.

An attorney-in-fact generally assumes the obligations of a fiduciary.[7] This fiduciary relationship, comparable to that created in a formal trust, subjects the holder of a power of attorney to a duty of loyalty obligating her to act in the best interests of her principal in exercising such power.[8] "A self-dealing transfer of the principal's property to the attorney-in-fact is voidable in equity unless the attorney-in-fact can show that the principal voluntarily consented to the interested transaction after full disclosure."[9] Such consent requires impartial advice from a competent and disinterested third person.[10]

Even where there is no formal appointment of a power of attorney, it is still possible for a fiduciary relationship to exist that will impose the legal presumption of fraud.[11] "The courts have consciously refused to delineate those situations where a fiduciary relationship may exist .... [since] in the ramifications of human activity, it is undesirable to fix a rigid limitation on the application of such a salutory principle."[12] Given this doctrine, the finding of a fiduciary relationship is a factual inquiry that requires an examination into whether the "relationship is of such a confidential or dependent nature as to rise to fiduciary status."[13] Upon the finding of a fiduciary relationship, the party seeking to sustain the transfer can overcome the presumption of fraud by showing the fairness of the transaction.[14]

The facts in this case give rise to two sources of a fiduciary relationship that would impose a burden on Newborn to demonstrate that the transfer of the house should be upheld. The first is based on Newborn's status as Coleman's attorney-in-fact. The second derives from the personal relationship between Coleman and Newborn. Of course, in a strong sense, these are two aspects of the same reality-the reasons Coleman made Newborn her attorney-in-fact arise out of the long-term relationship of trust between the sisters and, in Coleman's case, her growing dependency on Newborn.

### A. The Power Of Attorney

Coleman contends that even though Newborn did not effectuate the transfer of the house by use of her power of attorney, this court should still find that the transfer of the deed constituted a self-dealing transaction. In support of this claim, Coleman relies on the Delaware Supreme Court's ruling in *Stegemeier v. Magness*,[15] where a testamentary trustee who purchased trust property from the trust was found to be self-dealing even though the trustee did not have the power to sell the property. The Supreme Court defined self-dealing, under trust law, as occurring when the fiduciary has a "personal interest in the subject transaction of such a substantial nature that it *might* have affected his judgment in material

7. *Faraone v. Kenyon*, 2004 WL 550745, at *11 (Del.Ch. Mar.15, 2004).

8. *Id.*

9. *Id.*

10. *See id.*

11. *See Swain v. Moore*, 71 A.2d 264, 267 (Del. Ch.1950).

12. *Id.*

13. *White v. Lamborn*, 1977 WL 9612, at *4 (Del.Ch. Mar.15, 1977).

14. *Id.*

15. 728 A.2d 557 (Del.1999).

connection." [16] More directly, in *Schock v. Nash,* the Delaware Supreme Court concluded that the principles of trust law apply to someone, like Newborn, who acts as another's attorney-in-fact. [17]

Although Newborn did not directly arrange for or sign the deed using the power of attorney, she undoubtedly was aware of the plan to deed the property to her and very likely played a key role in formulating that plan with Coleman. Newborn also acted to accept the transfer which she must have known was contrary to Coleman's best interests. Thus, it can be said that, like the trustee in *Stegemeier,* Newborn permitted her personal interest to cloud her judgment in a manner that was disloyal to Coleman. As Coleman's fiduciary, Newborn had a duty to act in Coleman's best interests. Instead, the evidence suggests that Newborn worked on Coleman's fear of losing her house to secure the transfer of that property to herself on terms that cannot be shown to be fair to Coleman. There may or may not have been additional understandings or agreements that the parties have not admitted to in their testimony. But, even if there were not, the transaction was certainly unfair to Coleman and should be set aside in equity. [18]

Newborn relies heavily on the assistance provided to Coleman by Shumaker in arguing that this court should uphold the transfer. However, Shumaker did not provide the level of counsel necessary to validate the transfer. At trial, it was clear that Shumaker merely served the discrete function of preparing the deed and taking it to Coleman for execution. While Shumaker did present Coleman with a letter describing the consequences of the transfer and the possibility of retaining a life estate, she could not recall Coleman reading the letter or the deed. Shumaker was also unaware that Coleman was legally blind in one eye and she could not remember reading the letter to Coleman to ensure she understood its contents. Even though Shumaker did recall explaining the consequences of the transfer to Coleman over the phone some time before the transfer, there is no indication that Coleman appreciated these warnings, there was no discussion of Coleman's financial or living situation, and Shumaker made no inquiry into how the transfer would specifically affect Coleman.

### B. *The Confidential Relationship*

Alternatively, the close personal relationship of trust and dependency that Coleman shared with Newborn imposes a fiduciary duty on Newborn with the accompanying legal presumption of fraud. As already discussed, courts have declined to name the specific circumstances that give rise to such a fiduciary relationship. [19] There is no question on this record, howev-

---

16. *Stegemeier,* 728 A.2d at 564 (quoting *Vredenburgh v. Jones,* 349 A.2d 22, 39 (Del.Ch. 1975)).

17. 732 A.2d 217, 225–226 (Del.1999).

18. This analysis is consistent with the cases cited in the plaintiff's briefs involving the misuse of powers of attorney. In *Faraone,* 2004 WL 550745, a son procured a power of attorney from his mother and used this power to transfer his mother's assets to his own accounts. The court in *Faraone* stated that, "because [he] violated the duty of loyalty that

flowed from his status as ... attorney-in-fact, all self-dealing transactions in which he engaged in that capacity ... are void." *Id.* at *11. The only distinction between *Faraone* (as well as the other cases cited by the plaintiff) and this case is that Coleman signed the deed herself. Given the state of the relationship between Coleman and Newborn, revealed by the record in this case, that distinction is not meaningful.

19. *Swain,* 71 A.2d at 267.

er, that Coleman and Newborn shared a fiduciary relationship. This conclusion is drawn from the evidence of Coleman's alienation from the rest of her family, including all of her children and their spouses, and her consequent dependency on her sister for physical and emotional support and a growing list of small and large chores.

*Swain v. Moore*[20] and *White v. Lamborn*[21] are instructive. The facts in *Swain* have been summarized as follows:

> [A] lonely man of 73 years who was estranged from his family developed an affection for a younger couple, and became dependent upon them, and the couple took advantage of his affection by accepting gifts from him[. It] was held that a fiduciary relationship existed, and that consequently the couple could not retain money and property transferred to them as a result of their exploitation.[22]

In reaching its decision, the court reasoned that "[t]he relative position of parties may be such that a donor must be saved from himself, if not by the intended donee's refusal, then by court action." [23] A similar concern is embodied in the ruling in *White*, a case involving an elderly man who conveyed his farm to a woman 25 years his junior. At the time of the transfer the couple had been involved in an intimate relationship for nine years. When the affair began, the man was married, but after several years his wife passed away, which made the man even more obsessed with and dependent upon his mistress. The man relied solely on the mistress for emotional support and financial advice and appointed her his attorney-in-fact. The court found that these facts gave rise to a fiduciary relationship, even though the man had no apparent physical or mental disability. The discussion in *Swain* articulates this court's interest in protecting those most vulnerable from themselves, when the beneficiary of their imprudence fails to do so. The court in *White* also stressed the importance of this principle and recognized its utility in the framework of the equitable powers of the Court of Chancery. These cases reinforce this court's conclusion that equity should intervene to protect Coleman and to restore her property to her.

At the time Coleman executed the property transfer, and during the preceding months, she was suffering from a variety of physical and psychological problems.[24] This circumstance rendered her unstable, immobile, and incapable of living by herself or managing her affairs. Coleman became heavily reliant on the assistance of others. Her dependency and vulnerability was intensified due to a lack of a stable, meaningful relationship with anyone other than Newborn. Not only was Newborn the only person who had any consistent contact with Coleman, she also was Coleman's attorney-in-fact and liaison to the outside world. Newborn received Coleman's mail and managed her financial affairs. Newborn was also actively engaged in and responsible for Coleman's place-

---

20. 71 A.2d 264.

21. 1977 WL 9612.

22. *Id.* at *3.

23. 71 A.2d at 268.

24. While Coleman's medical condition was disputed, the parties agree, as discussed, that Coleman is legally blind in one eye, has diabetes, a thyroid disorder, a heart condition, degenerative arthritis, and has suffered from depression. Newborn downplayed Coleman's past psychological problems, but Coleman is legally incompetent, currently resides in the DPC, and has been voluntarily committed to mental health facilities several times in the past.

ment in an assisted living facility. There is also no question that Coleman considered Newborn her only remaining friend and closest confidant.[25] In a letter to Newborn in June of 2004, Coleman wrote:

> When Virgil died ... you moved to Delaware [and] have been in my life helping me, taking me to dinner, doctors [and] shopping. I did not have anybody. I needed you. You are the only one who has stuck by me.[26]

It is clear from these facts that Coleman and Newborn had a confidential relationship.

 Since this court finds a fiduciary relationship exists, Newborn has the burden of demonstrating the fairness of the transaction.[27] This burden increases significantly where, as here, there is a transfer for no consideration.[28] Newborn argues that the transfer should be upheld because it was a gift that was consciously made by Coleman with the advice of independent legal counsel.

As discussed above, this court cannot be sure of the true reasons for the transfer, but it appears to have been the centerpiece of a scheme to shield Coleman's house from a forced sale to pay for her medical care, while at the same time qualify Coleman for discounted assisted living. Coleman must have known that her property would inevitably be sold to pay for ever-increasing medical expenses. Understandably, she wanted to avoid this result.

Regardless of the true nature of the plan between Coleman and Newborn, the transfer was clearly not intended as a gift. Moreover, the conveyance has made Coleman potentially ineligible for Medicaid and left her in the DPC with few remaining options for her placement. In these circumstances, this court will overturn the transfer. Even though Coleman is not entirely innocent in this transaction, it is still appropriate for this court to protect her from her impulsive and harmful conduct.[29]

When considering the facts of this case in the context of the holding in *Swain,* Coleman's conscious decision to sign the deed cannot serve to validate the transfer. As articulated in *Swain,* "the defense that a donor consciously made the gift[ ] will not normally prevent a court of equity from undoing acts of such extreme generosity in a situation such as is here presented."[30] Moreover, for the same reasons stated earlier in this opinion, the legal function performed by Shumaker is insufficient to warrant upholding the transfer. Notably, the court in *Swain,* after finding that a fiduciary relationship existed, declined to even consider whether the independent legal advice alleged affected the determination.[31]

---

**25.** Coleman's relationship with Newborn, like that of the parties in *White,* also created animosity between Coleman and her children and contributed to Coleman's isolation. At her deposition, Coleman stated: "I trusted her. I even lost my friendship with my daughter, Linda, because of her. Because they wanted to get Linda to be power of attorney and I said, No, Blanche is handling it." Coleman Dep. 36.

**26.** App. to Pl.'s Pre–Trial Br. Ex. A.

**27.** *White,* 1977 WL 9612, at *4; *Scott v. Williams,* 1967 WL 88967, at *3 (Del.Ch. Feb.18, 1967).

**28.** *Scott,* 1967 WL 88967, at *3.

**29.** Newborn has not moved into the house or made any significant investments in it. Setting aside the transfer will not result in any inconvenience aside from the obvious monetary consequences.

**30.** *Swain,* 71 A.2d at 268.

**31.** *Id.* Newborn also testified that Coleman was declared incompetent by Dr. Wolfgang

## V.

For the foregoing reasons, the plaintiff's claims for an accounting for income and an accounting for personal property are DENIED. The plaintiff's conveyance of the deed to the defendant is RESCINDED. The defendant is not responsible for any damage to the property and the defendant will be compensated for any payments in support of the property during her ownership. The parties are directed to confer and submit a form of order within 10 days of the date of this opinion.

Burton in February 2006. Give the close proximity of this declaration to the transfer, the utility of independent legal counsel is doubtful. To be clear, neither party contested Coleman's competency at the time of the transfer, but when considering her mental stability, the subsequent declaration of incompetency, and Coleman's transfer to the DPC only months later, it is unlikely that she could truly have appreciated the advice given by her independent legal counsel. Thus, this court is even more reluctant to uphold the transaction based on Shumaker's advice.