# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AARON HOUSEMAN and NANCY HOUSEMAN, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 8897-VCG |
| ERIC S. SAGERMAN, THOMAS D. WHITTINGTON, CLINTON S. LAIRD, BROCK J. VINTON, RAYMOND IBARGUEN, GEORGE D. SERGIO and HEALTHPORT TECHNOLOGIES, LLC, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 4, 2021
Date Decided: July 20, 2021

Eric M. Andersen, of ANDERSEN SLEATER SIANNI LLC, Wilmington, Delaware, *Attorneys for Plaintiffs*.

Stephen L. Caponi and Matthew B. Goeller, of K&L GATES LLP, Wilmington, Delaware, *Attorneys for Defendant Thomas D. Whittington*.

**GLASSCOCK, Vice Chancello**r

This is the latest (alas, not the last) round of this multi-faceted and testudinally-paced litigation over the acquisition of equity by the Plaintiffs, Aaron and Nancy Houseman, in Universata, Inc. ("Universata"), and the distribution of the proceeds of a cash-out merger of that entity. The current dispute involves alleged wrongdoing of a stockholders' representative in administration of the proceeds of the merger. That matter, which involved many specific challenged decisions of the stockholders' representative, was assigned to a Special Master. The Special Master issued a final report largely, but not entirely, supporting the decisions of the stockholders' representative. The Plaintiffs took exception to the report. They make two general exceptions: that the report erroneously (1) supported the creation of an escrow from merger proceeds to indemnify the purchaser, rather than requiring a group of large stockholders (referred to in the merger agreement as the "Owners") to indemnify the purchaser out-of-pocket; and (2) applied an abuse of discretion standard of review to the actions of the stockholders' representative. The Plaintiffs also make numerous objections to the specific findings of the Special Master's final report, some dependent on the success of the two general objections.

As required by our law, I have reviewed the thoughtful and thorough Special Master's final report *de novo*.[1] I find that the escrow fund was properly created from sale proceeds, as called for in the merger agreement, and that the appropriate

---

[1] *See generally DiGiacobbe v. Sestak*, 743 A.2d 180 (Del. 1999).

standard of review for actions of the stockholders' representative is subjective good faith. Unfortunately, ultimate resolution of the exceptions will require the parties to inform me as to what effects these general rulings have on the specific exceptions.

An adumbration of the facts, and my reasoning, is below.

## I. BACKGROUND

The Plaintiffs initiated this action in 2013, challenging the merger between Universata and a wholly-owned subsidiary of HealthPort Technologies, LLC ("HealthPort").[2] My Order of February 2, 2015 appointed Mr. James P. Dalle Pazze (the "Special Master") to review and make findings as to the administration of a certain portion of the proceeds paid in connection with that merger; and to report such findings to the Court in light of the allegations raised in paragraphs 50–62 of the Plaintiffs' Second Amended Complaint.[3] In his Final Report, the Special Master summarized both the stipulated facts and those facts found after trial.[4] I provide an abridged version of the facts here as background for my analysis of the general exceptions.[5] I direct interested readers to *Houseman v. Sagerman*, 2015 WL 7307323 (Del. Ch. Nov. 19, 2015) for a more robust recitation.

---

[2] *See generally, e.g.*, Compl., Dkt. No. 1.
[3] Order Appointing Special Master 1, Dkt. No. 129; *see also* Amended Verified Compl. ¶¶ 50–62, Dkt. No. 106.
[4] Final Report by Special Master James P. Dalle Pazze 3–30, Dkt. No. 204 [hereinafter "FR"].
[5] Unless otherwise noted, the facts in this Memorandum Opinion were stipulated by the parties or proven by a preponderance of the evidence. To the extent there was conflicting evidence, I have weighed the evidence and made findings *de novo* based on the preponderance of the evidence.

*A. The Parties*

The Plaintiffs are former stockholders of Universata.[6] Plaintiff Aaron Houseman ("Houseman") is also a former director of Universata.[7]

Defendant Thomas D. Whittington ("Whittington") was a director and shareholder of Universata from February 2007 until June 1, 2011.[8] Whittington also served as the stockholders' representative in connection with the merger, as discussed further below.

The Plaintiffs became stockholders of Universata in 2009, when they exchanged a portion of the debt Universata owed to them for Universata common stock.[9] In connection with that transaction, the Plaintiffs entered into an agreement with Whittington—then Universata's Chairman—whereby, subject to certain conditions, Whittington would personally purchase their 525,000 shares for $2.10 per share (the "Put Contract").[10] Houseman also became a director of Universata at this time.[11]

---

[6] Pre-Trial Stip. and Order ¶ 1, Dkt. No. 178 [hereinafter "Stip."].
[7] *Id.* ¶ 7.
[8] *Id.* ¶ 2.
[9] *Id.* ¶ 5.
[10] *Houseman v. Sagerman*, 2015 WL 7307323, at *1 (Del. Ch. Nov. 19, 2015).
[11] Stip. ¶ 7.

*B. Factual Background*

### 1. The Merger Agreement

In late 2010, HealthPort approached Universata about a potential acquisition.[12] On May 31, 2011, Universata and HealthPort executed a merger agreement (the "Merger Agreement") whereby Universata would merge into HealthPort Acquisition Subsidiary, Inc., a wholly-owned subsidiary of HealthPort (the "Merger").[13]

Pursuant to the Merger Agreement, HealthPort agreed to acquire Universata for $17.5 million (the "Purchase Price").[14] Of the Purchase Price, $2.5 million was held in escrow (the "Escrow Amount").[15] In exchange, the stockholders of Universata (the "Shareholders") were to receive three forms of consideration: (1) $1.02 per share in cash on June 1, 2011; (2) a right to receive up to $.27 per share in cash to be distributed by July 1, 2012 from the Escrow Amount; and (3) shares in a new company formed by Universata (Database Logic, Inc.) to hold a patent owned by Universata that was not part of the Merger.[16]

A subset of the Shareholders collectively owning over 72% of Universata's shares (the "Owners") were parties to and signed the Merger Agreement—

---

[12] *Id.* ¶ 8.
[13] *Id.* ¶ 9.
[14] JX 93, SMP-3052 (Merger Agreement § 1.3).
[15] *Id.*; *see also* Stip. ¶ 11.
[16] Stip. ¶ 11. The group defined as the Shareholders included holders of in-the-money options and warrants. JX 93, SMP-3050 (Merger Agreement § 3).

4

Commonwealth Ventures, Inc, Thomas D. Whittington, Brock J. Vinton, Richard F. Whittington, and Clinton S. Laird.[17]  Houseman did not sign the Merger Agreement.[18]

### 2. The Shareholders' Representative

Whittington was designated in the Merger Agreement to act as Universata's stockholders' representative in connection with the Merger.[19]  The Merger Agreement provided that "[t]he Owners hereby appoint Thomas D. Whittington (the "Shareholders' Representative") as their attorney-in-fact with full power . . . to perform any and all acts necessary or appropriate in connection with the Agreement."[20]

Among other responsibilities, the Shareholders' Representative was charged with "disbursing among the Shareholders the cash portion of the Purchase Price and any other payments paid to Shareholders under this Agreement."[21]  It is undisputed that the Shareholders' Representative was responsible for distributing the Escrow Amount.[22]  Additionally, the Shareholders' Representative was empowered to "do[]

---

[17] *See* JX-93, SMP-3116–SMP-3120.
[18] *See* Stip. ¶ 10.
[19] *See id.* ¶ 12; JX 93, SMP-3111 (Merger Agreement § 12.16).
[20] JX 93 SMP-3111 (Merger Agreement § 12.16(a)).  I follow the Final Report in using the term "Shareholders' Representative" when referring to Whittington in his capacity as such, and the term "Whittington" when referring to Whittington as an individual not acting in his capacity as Shareholders' Representative.  *See* FR 4 n.1.
[21] *Id.* (Merger Agreement § 12.16(a)(ii)).
[22] Stip. ¶ 11.

any and all things and tak[e] any and all action that the Shareholders' Representative, in such Person's sole and absolute discretion, may consider necessary, proper or convenient in connection with or to carry out the activities described in this Section 12.16 and the transactions contemplated by this Agreement."[23]  The Merger Agreement further provided that the actions of the Shareholders' Representative "shall be binding upon all of the Owners and Shareholders."[24]  The Shareholders' Representative did not have "any duties or responsibilities except those expressly set forth in [the Merger Agreement]."[25]

In carrying out his responsibilities, the Shareholders' Representative was entitled to rely upon "any statements furnished to it by any Owner, Shareholder or the Purchaser, or any other evidence deemed by the Shareholders' Representative to be reliable and . . . shall be entitled to act on the advice of counsel selected by it."[26]

### 3. Indemnification Obligations

The terms of the Merger required "no hair on the deal," meaning that Universata had to be essentially debt-free.[27]  The Merger Agreement directs that the Escrow Amount may be used to satisfy certain of Universata's post-closing obligations.[28]  For some, but not all, indemnification claims "the maximum amount

---

[23] JX 93 SMP-3111 (Merger Agreement § 12.16(a)(iv)).
[24] *Id.* SMP-3112 (Merger Agreement § 12.16(d)).
[25] *Id.* SMP-3111 (Merger Agreement § 12.16(c)).
[26] *Id.*
[27] *See* Trial Tr. 378:1–378:19.
[28] Stip. ¶ 11.

of Losses that [HealthPort was] entitled to recover" was limited to the Escrow Amount.[29]

The Merger Agreement addressed the possibility of Universata having either liabilities or assets in excess of what the parties originally contemplated. The Merger Agreement provided for a Purchase Price Adjustment, upward or downward, as appropriate. This adjustment amount was to be paid out of the Escrow Amount, *e.g.*, if the Adjusted Purchase Price was lower than the Purchase Price, HealthPort was entitled to recover from the Escrow Amount.[30]

The Merger Agreement also addressed the risk that Universata's post-closing revenues could be lower than originally contemplated. The Purchase Price was subject to a downward adjustment if Universata's revenues for the year following the closing were less than $12 million—but not, I note, a reciprocal upward adjustment if revenues were higher.[31] HealthPort was entitled to be paid from the Escrow Amount in the event of such a revenue shortfall.[32]

For certain claims, the Merger Agreement further provided that HealthPort could recover up to an additional $3.68 million for a total Indemnity Cap (including

---

[29] JX-93, SMP-3083 (Merger Agreement § 8.4(b)).
[30] *Id.* SMP-3054–SMP-3056 (Merger Agreement § 1.6). If the Adjusted Purchase Price was *higher* than the Purchase Price, that amount was paid to the Shareholders' Representative out of the Escrow Amount. *See id.* SMP-3055–SMP 3056 (Merger Agreement §§ 1.6(e)–(f)).
[31] *Id.* SMP-3056 (Merger Agreement § 1.7).
[32] *Id.*

7

the Escrow Amount) of $6.18 million.[33]   The Owners (and not the stockholders generally) were jointly responsible for claims "in excess of or after depletion of the Escrow Amount."[34]

I note that it is the role of the Shareholders' Representative that is at issue here.  The fairness of the Merger itself to the stockholders of Universata is not at issue.

*C. Procedural History*

The Special Master held a hearing in the form of a trial on October 24, 25, and 26, 2017.[35]  He issued evidentiary rulings on October 30, 2018, which I affirmed in part and overruled in part on May 2, 2019.[36]  The Special Master issued his Draft Report on March 2, 2020.[37]  The Plaintiffs briefed exceptions to the Draft Report from April until June 2020[38] and the Special Master issued his Final Report on October 19, 2020.[39]

---

[33] *Id.* SMP-3082–SMP-3083 (Merger Agreement § 8.4).
[34] *Id.* SMP-3082 (Merger Agreement § 8.2(c)).
[35] Letter Ruling on Pls.' Evidentiary Objections 1, Dkt. No. 185.
[36] *See generally id.*; Tr. of Oral Arg. on Requests for Court Review of Evidentiary Rulings by the Special Master and Rulings of the Court, Dkt. No. 195.
[37] Draft Report, Dkt. No. 196.
[38] Pls.' Br. in Supp. of Exceptions to the Special Master's Draft Report, Dkt. No. 201; Def.'s Br. in Opp'n to Pls.' Exceptions to the Special Master's Draft Report, Dkt. No. 202; Pls.' Reply Br. in Supp. of Exceptions to the Special Master's Draft Report, Dkt. No. 203.
[39] *See generally* FR.

The Plaintiffs took exceptions to the Final Report pursuant to Court of Chancery Rule 144 (the "Plaintiffs' Exceptions").[40] The parties fully briefed the Plaintiffs' Exceptions from November 2020 to January 2021.[41] I heard oral argument on the exceptions on March 3, 2021 and consider the matter submitted for my consideration as of that date.

## II. LEGAL STANDARDS

When exceptions are taken to a Master's final report, the Court of Chancery applies a *de novo* standard of review with respect to issues of both law and fact.[42] Typically, this court reviews exceptions "on the record before the Master, unless the Court determines otherwise for good cause shown."[43] A new hearing before the Vice Chancellor is required only "where exceptions raise a *bona fide* issue as to dispositive credibility determinations."[44] Otherwise, the Court may conduct its review on the basis of the record without additional live testimony, as I have done here.[45]

---

[40] Exceptions to Special Master's Final Report, Dkt. No. 205.

[41] Pls.' Br. in Supp. of Exceptions to the Special Master's Final Report, Dkt. No. 206 [hereinafter "Pls.' OB"]; Def.'s Br. in Opp'n to Pls.' Exceptions, Dkt. No. 209 [hereinafter "Def.'s AB"]; Pls.' Reply Br. in Supp. of Exceptions to the Special Master's Final Report, Dkt. No. 210 [hereinafter "Pls.' RB"].

[42] *See* Ct. Ch. R. 144(a); *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999).

[43] Ct. Ch. R. 144(a).

[44] *DiGiacobbe v. Sestak*, 743 A.2d at 184.

[45] *See id.*

III. ANALYSIS

The Plaintiffs' Exceptions consist of two parts.[46]  First, they identify two general exceptions (the "General Exceptions") challenging legal conclusions from the Final Report:[47] (1) the Report found that the Escrow Amount was correctly funded by all of Universata's former shareholders from sale proceeds to pay post-closing indemnification claims—instead, per the Plaintiffs, the Owners were solely responsible for indemnifying HealthPort and should have funded the escrow personally; and (2) the Special Master applied the wrong standard of review to actions taken by the Shareholders' Representative in connection with the Merger.[48] The Plaintiffs also challenge the Final Report's conclusions as to specific distributions made by the Shareholders' Representative out of the merger consideration (the "Specific Exceptions").  I analyze the General Exceptions below.

*A. How Should Indemnification Claims be Funded?*

The Plaintiffs' first General Exception contends that the Special Master incorrectly interpreted the Merger Agreement to provide that certain of Universata's

---

[46] Whittington takes the position that the Plaintiffs' General Exceptions have been waived.  Def.'s AB 3, 6.  For purposes of this Memorandum Opinion, I assume without deciding that no waiver has occurred.

[47] The Plaintiffs describe their General Exceptions as "address[ing] two legal rulings from the Final Report: (a) former shareholders of an acquired Delaware corporation are on the hook to indemnify the first $2.5 million of obligations of the Delaware corporation; and (b) the shareholder representative has the 'sole and absolute discretion' to distribute the Merger Consideration however he sees fit."  Pls.' OB 1.

[48] At oral argument on the Plaintiffs' Exceptions, the Plaintiffs clarified their position that the applicable standard is entire fairness.  Tr. of March 4, 2021 Oral Arg. 10:10–11:6.

liabilities could paid from the Escrow Amount funded by Merger consideration. This exception, I confess, is not entirely clear to me. The Plaintiffs do not appear to dispute the express terms of the Merger Agreement providing that the Escrow Amount may be used to satisfy certain pre- and post-closing obligations. Rather, they seem to argue that the Escrow Amount should not have been established from the total Purchase Price.

They note: "Section 8.2(a) of the Merger Agreement provides that the Owners (a small subset of controlling shareholders that does not include the Plaintiffs) were on the hook to cover the indemnification obligations owed to HealthPort—**not all of the shareholders**."[49] They also point out that, while Section 1.3 of the Merger Agreement "provides that a $2.5 million escrow would be set up, . . . it does not provide [that the] escrow will be funded by **all** the shareholders for post-closing obligations that were personally guaranteed by the **Owners**."[50] Thus, their exception, as I understand it, is that the Owners should have jointly deposited the requisite $2.5 million into the Escrow account from their own funds.

Section 1.3 of the Merger Agreement provided that the Escrow Amount, "shall be delivered in escrow to the Escrow Agent by *the Purchaser* to be disbursed in accordance with that certain Escrow Agreement . . . and the remainder of the

---

[49] Pls.' OB 3 (emphasis in original).
[50] *Id.* 5 (citing JX-93, SMP-3052).

11

Purchase Price will be paid to the Shareholders' Representative, for itself and on behalf of the Shareholders."[51] This provision makes clear that the Escrow Amount was considered part of the $17.5 million Purchase Price. The Escrow Amount was directly funded by the Purchaser, and no funding obligation was placed on the Owners. Thus, any amounts permitted to be deducted from the Escrow Amount would work a proportionate deduction on each Shareholders' pro rata payout from the Merger.

The wording of Section 8.2(a)—"each Owner agrees to" indemnify HealthPort—does not change this analysis. Section 8.2 outlines the types of claims the Owners are required to indemnify. As made clear in Section 8.2(c), HealthPort "may seek recovery from such claims *in excess of or after depletion of* the Escrow Amount directly from the Owners."[52]

Lastly, the Plaintiffs argue that, even if the Merger permitted HealthPort to be indemnified from the Escrow Amount, that provision would be illegal and unenforceable. They cite to *Cigna Health & Life Insurance Company v. Audax Health Solutions* as support for the proposition that, as stockholders who did not consent to the Merger, they cannot be bound by Universata's indemnification obligations.[53] In *Cigna*, the Court concluded that the indemnification obligation

---

[51] JX-93, SMP-3052 (emphasis added).
[52] *Id.* SMP-3082 (emphasis added).
[53] *See Cigna Health & Life Ins. Co. v. Audax Health Sols., Inc.*, 107 A.3d 1082 (Del. Ch. 2014).

imposed by the merger agreement was void and unenforceable because it violated 8 *Del. C.* § 251. The post-closing adjustments permitted by the merger agreement as indemnification were not limited in amount or in duration. Accordingly, the stockholders would never have been able to know the exact value of the merger consideration and the merger agreement failed to set forth "the cash, property, rights or securities of any other corporation or entity which the holders of such shares are to receive" as required by § 251(b)(5). Thus, *Cigna* did not reach the more general question whether post-closing price adjustments can bind non-consenting stockholders. Here, the Merger Agreement explicitly limits the Plaintiffs' indemnification obligation to the Escrow Amount, and, with the exception of certain fundamental representations and warranties guaranteed solely by the Owners, the obligations do not survive indefinitely. The terms of the indemnification rights here are both made explicit and limited in duration. Therefore, *Cigna* is inapplicable.

*B. What Standard of Review Applies to the Actions of the Shareholders' Representative?*

Next, the Plaintiffs contend that the Special Master applied the wrong standard of review to the actions of the Shareholders' Representative. I understand this exception to have two parts that are argued in the alternative. First, the Plaintiffs reject the Special Master's foundational assumption that the Shareholders' Representative can act on their behalf at all. Per the Plaintiffs, because Section 12.16 states that only the Owners appoint the Shareholders' Representative, that section

13

only applies to the Owners and not to them. Second, and assuming that the Shareholders' Representative is appointed on behalf of all Shareholders, the Plaintiffs argue in briefing that the appropriate standard of review is that of "an accounting." At oral argument, they clarified that, by this, they mean entire fairness review.[54] In other words, rather than the abuse of discretion standard applied by the Special Master, the Shareholders' Representative should bear the burden of demonstrating that its expenditures were permissible and entirely fair to the Shareholders.

1. The Shareholders' Representative carries out the Merger Agreement on behalf of all Shareholders.

The fact that the Shareholders' Representative was appointed by the Owners, and not all Shareholders, does not limit his ability to act on behalf of the other Shareholders.[55] The Merger Agreement provides that "[t]he Owners hereby appoint Thomas D. Whittington (the "Shareholders' Representative") as their attorney-in-fact with full power . . . to perform any and all acts necessary or appropriate in connection with the Agreement."[56] The Merger Agreement further provides that the actions of the Shareholders' Representative "shall be binding upon all of the Owners and Shareholders."[57] Generally, the actions of a stockholders' representative are

---

[54] Tr. of March 4, 2021 Oral Arg. 10:10–11:6.
[55] *See Aveta Inc. v. Cavallieri*, 23 A.3d 157, 171, 178 (Del. Ch. 2010).
[56] JX 93 SMP-3111 (Merger Agreement § 12.16(a)).
[57] *Id.* SMP-3112 (Merger Agreement § 12.16(d)).

14

binding on all stockholders.[58]  In *Aveta Inc. v. Cavallieri*, this Court addressed whether non-signatories to a purchase agreement could be bound by the post-closing actions of a shareholders' representative.[59]  The Court concluded that, because post-closing adjustments are generally permissible as a matter of corporate law, the scope of the contractual grant of authority to an agent to administer those adjustments is irrelevant.  Accordingly, "it does not matter whether . . . the Purchase Agreement gave [the representative] authority to act on behalf of some, all, or none of [the] stockholders. All that [Section 251] required was for [the representative] to be designated as the individual who would follow the procedures and make or participate in the determinations called for by the Purchase Agreement."[60]  Here, as in *Aveta*, the Merger Agreement designates the Shareholders' Representative to carry out the actions contemplated by that Agreement.  Therefore, the Shareholders, whether signatories or not, are bound by the actions and determinations of the Shareholders' Representative to the extent they are in accordance with the Merger Agreement's terms.

---

[58] *Cf. Cigna Health & Life Ins. Co. v. Audax Health Sols., Inc.*, 107 A.3d 1082, 1086 (Del. Ch. 2014) (noting that the stockholder representative's actions are binding on the former stockholders); *Aveta Inc. v. Cavallieri*, 23 A.3d at 171, 178.

[59] *See generally Aveta Inc. v. Cavallieri*, 23 A.3d 157.

[60] *Id.* at 178.  I note that the above holding was rendered as to Puerto Rico's corollary to Section 251, but, in any event, it is persuasive authority.

## 2. The Shareholders' Representative must act in subjective good faith.

The Special Master concluded that the appropriate standard of review of the actions challenged in the Plaintiffs' Specific Exceptions was whether the Shareholders' Representative had abused his discretion. The Plaintiffs argue that Delaware law prohibits the contractual modification of a shareholders' representative's fiduciary duties and, therefore, that the Merger Agreement's grant of "sole and absolute discretion" is impermissible. In opposition to the Plaintiffs' Exception, Whittington argues that the Shareholders' Representative is not a fiduciary, that he owes only contractual duties to the Shareholders, and that the Merger Agreement grants him "sole and absolute discretion to take all necessary steps to protect the Shareholders' interests."[61] Neither, in my view, is entirely correct.

Based on the language of the Merger Agreement, I conclude that the fiduciary duties of the Shareholders' Representative were intended to be limited to a duty of subjective good faith. The Special Master's Final Report correctly noted that a shareholders' representative, as attorney-in-fact for the selling shareholders, generally assumes the obligations of a fiduciary.[62] However, the duties of an

---

[61] Def.'s OB 9.

[62] FR 64; *accord Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 632 n.2 (Del. Ch. 2011) (noting that shareholders' representative was attorney-in-fact for selling shareholders); *Coleman v. Newborn*, 948 A.2d 422, 429 (Del. Ch. 2007) ("An attorney-in-fact generally assumes the obligations of a fiduciary.").

16

attorney-in-fact, like those of some other types of fiduciaries, may be modified by contract.[63] The Shareholders' Representative is not, as the Plaintiffs seem to assume, a corporate fiduciary.[64] Rather, the Shareholders' Representative is an agent of the Shareholders whose powers and responsibilities are circumscribed by contract.[65] The Merger Agreement explicitly rejected the Shareholders' Representative's common law duties, by providing that "[t]he Shareholders' Representative shall not have any duties or responsibilities except those expressly set forth in this Agreement."[66] The Shareholders' Representative's duties are, broadly, "to perform any and all acts necessary or appropriate in connection with this Agreement,"[67] including "doing any and all things and taking any and all action that the Shareholders' Representative, in such Person's sole and absolute discretion, may consider necessary, proper or convenient in connection with or to carry out the

---

[63] *Nash v. Schock*, 1997 WL 770706, at *3 (Del. Ch. Dec. 3, 1997) ("Because the fiduciary relationship between the principal and her attorney-in-fact is created and governed by contract, however, the principal may agree to waive or otherwise modify the implied fiduciary duty of loyalty and permit her attorney-in-fact to deal with the principal's assets for the benefit of another or even for the benefit of the attorney-in-fact."), *aff'd and remanded*, 732 A.2d 217 (Del. 1999); *see also Gatz Properties, LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1218 (Del. 2012) (noting that contractual provisions establishing a fiduciary standard in the limited liability company agreement may preclude the need for analysis of statutory standards).
[64] *See, e.g.*, Pls.' OB 6.
[65] *See Fortis Advisors LLC v. Allergan W.C. Holding Inc.*, 2020 WL 2498068, at *2 (Del. Ch. May 14, 2020) ("Delaware law presumes parties are bound by the language of the agreement they negotiated.").
[66] *See* JX 93 SMP-3111 (Merger Agreement Section 12.16(c)) ("The Shareholders' Representative shall not have any duties or responsibilities except those expressly set forth in this Agreement.")
[67] *Id.* (Merger Agreement Section 12.16(a)).

activities . . . contemplated by this Agreement."[68]  This standard, to my mind, is equivalent to a duty of subjective good faith.  The discretion of the Shareholder's Representative is cabined by his determination that a contemplated action is "necessary, proper or convenient" in connection with carrying out the Merger Agreement on behalf of the Shareholders.  Should he act without such a determination, he has breached a duty.  The Merger Agreement authorizes him to act on the Shareholders' behalf.  In that capacity, the Shareholders' Representative has an obligation to protect the Shareholders' rights under the Merger Agreement.  The actions of the Shareholders' Representative—including those challenged in the Plaintiffs' Exceptions—are appropriate, therefore, to the extent the Shareholders' Representative subjectively determined those actions to be "necessary, proper or convenient" to protect the Shareholders' interests.[69]

## IV. CONCLUSION

This concludes the first phase of my *de novo* review of the Final Report in light of the Plaintiffs' Exceptions.  The parties should agree on a schedule to submit brief memoranda on what exceptions remain pending following my decision here, including whether any conclusions of the Special Master should be reconsidered following my decision as to the standard of review applicable to actions of the

---

[68] *Id.* (Merger Agreement Section 12.16(a)(iv)).

[69] Conversely, the actions of the Shareholders' Representative would not be appropriate if, for example, they were undertaken to protect his own interests or to benefit himself.

Shareholders' Representative. Given the superannuated nature of this litigation, it is my intention to address these issues without resubmission of any issues to the Special Master, who is released from further service here. After I receive the parties' supplemental memoranda, I will consider the Specific Exceptions submitted for decision without need for further oral argument.