# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| LYNNE SACHS )<br><br>Petitioner, )<br><br>v. )<br><br>CAREN SACHS individually and )<br>as attorney-in-fact for DORIS SACHS, )<br>and STEVEN SACHS, )<br><br>Respondents. ) | C.A. No. 2018-0530-SEM |

## MASTER'S FINAL POST-TRIAL REPORT

Final Report: March 7, 2023
Date Submitted: November 15, 2022

Jason C. Powell and Thomas J. Reichert, THE POWELL FIRM, LLC, Wilmington, Delaware; *Counsel for Petitioner.*

Mary Ann Plankington, GAWTHROP GREENWOOD, PC, Wilmington, Delaware; *Counsel for Respondent Caren Sachs*.

Steven Sachs, Stevenson, Maryland; *Respondent.*

**MOLINA, M.**

Through this action, siblings dispute how their mother was treated in her final, vulnerable years, and whether her estate should be compensated to address alleged improprieties. One sibling, now the administrator of her mother's estate, argues that her sister breached her fiduciary duties, and her two siblings have failed to repay loans from their mother. She seeks judgment against her siblings and in favor of the estate to compensate for those breaches and unpaid loans; she also seeks equitable relief, including redirection of certain non-probate assets. The administrator also seeks judgment against her brother and in her personal favor for the administrator's portion of the life insurance payout from the decedent's death. Finally, the administrator seeks an order compelling the return of personal property and fee shifting for bad faith litigation conduct.

I entered judgment by default against the administrator's brother who failed to participate in these proceedings; he has also failed to respond to, or engage in, post-trial briefing. But the remaining sibling, the administrator's sister, fully participated at trial and contests the claims against her. She admits she owed fiduciary duties to her mother but denies she breached them. She further admits that her mother loaned money to her but contends the loan was repaid. Finally, the sister argues the administrator's claims for equitable relief and fee shifting are unsupported.

1

I hear these claims on the record developed during a two-day trial. On that record, I find judgment should be entered against the brother for the unpaid loan, the sister breached her fiduciary duties, and the sister has failed to demonstrate repayment of the loan from her mother in full. Regarding appropriate relief for the sister's breaches, I find the self-dealing transactions should be voided but that the sister should first be required to prepare a formal accounting, before damages or other remedies are addressed. I do, however, find the sister should be required to return the date-of-death value of a convenience account to the estate, the sister and brother should be required to return all personal property to the estate, and beneficiary accounts should be retitled and directed to the estate Finally, I find fees should not be shifting against the brother and the request to shift fees against the sister is premature; I do find that costs should be shifted to the administrator as the prevailing party in this action.

This is my final report.

## I.    BACKGROUND[1]

The parties' disputes concern their mother, Doris Sachs (the "Decedent"). The Decedent passed during the pendency of this action, although I did not have the pleasure of meeting her. I rely, instead, on the reflections of those who loved her. The Decedent was described as "a self-sufficient woman. She was bright, funny, witty."[2] But her life was not always easy. After separating from her husband in the mid-seventies, the Decedent raised her three children—Lynne, Caren, and Steven—on her own.[3] Per Lynne, the Decedent "did a lot for [her children] when [their] father was out of the picture. . . . [S]he sacrificed her life for [them]."[4]

The Decedent was a consistent person, residing in her home at 2514 Van Buren Street in Hyattsville, Maryland (the "House"), from the 1970's through 2015.[5] She was eager to remain self-sufficient. But as the Decedent moved into her

---

[1] The facts in this report reflect my findings based on the record developed at trial on August 1, 2022 and August 3, 2022. *See* Docket Items ("D.I.") 117. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcripts are in the form "Tr. #." D.I. 119-120. The parties' jointly submitted exhibits are cited as "JX __." JX1-15, 17-21, 23-27, and 59-62 were admitted without objection. Tr. 8:15. JX22 and JX58 were admitted during witness testimony. Tr. 43:17. JX16 was also admitted, in limited part. Tr. 69:23-70:7. JX7 and JX59 are the same document and I cite solely to JX7.

[2] Tr. 19:17-18.

[3] Tr. 19:19-21. I use first names for the parties for clarity purposes and intend no disrespect or familiarity.

[4] Tr. 154:21-155:1.

[5] *See* Tr. 21-23.

octogenarian years, she began to decline.[6]  With this decline came the alleged improprieties.

## A.    The Discoveries in 2014

On July 23, 2014, Lynne was visiting her mother and, together, they went to the Decedent's bank.[7]  There they learned that Steven had withdrawn more than $130,000.00 from a joint account he shared with the Decedent, without her knowledge or permission.[8]  Concerned, Lynne and the Decedent checked another account owned by the Decedent and saw a withdrawal for over $50,000.00.[9]  The Decedent explained to Lynne that the withdrawal was a loan to Caren (the "Loan"), but, per Lynne, the Decedent was not happy with the transaction.[10]

These discoveries led to two things: (1) a family meeting and (2) a new bank account.[11] At the family meeting, Steven admitted to taking the funds and signed a promissory note (the "Promissory Note").[12]  In the Promissory Note, Steven admitted that he "did in fact borrow $131,400" from the Decedent and promised to

---

[6] *See, e.g.*, Tr. 22:9-12, 23-24, 182:15-23.

[7] *See* Tr. 24:6-7.

[8] *See* Tr. 24:9-12.

[9] Tr. 24:19-24. *See* JX6.

[10] Tr. 25:2-12. Caren testified that the Loan was for the benefit of her business, Elements of Nutrition, LLC. Tr. 221:23-222:4.

[11] *See* Tr. 27:1-2.

[12] *See* JX5.

repay the full amount "no later than [his] 55th birthday on December 8, 2015."[13] Caren also promised to repay the Loan but did not sign a note or otherwise agree to specific terms.[14] Regarding the new bank account, the Decedent closed the joint account with Steven and transferred the remaining balance into a new account in her sole name with PNC Bank (the "PNC Account").[15] The PNC Account was opened on July 23, 2014 and the Decedent selected "Individual/sole proprietor" on the account registration and agreement form.[16]

In October 2014, Caren deposited $42,864.84 in the PNC Account, which she contends was partial payment on the Loan.[17] Caren testified that the remainder of the Loan was paid off through her purchase of a burial plot for the Decedent.[18] Caren purchased the burial lot in 2012 and expended a total of $9,448.64 (the "Burial Payment").[19] Caren explained that she "talked to [the Decedent] about paying her

---

[13] JX5. The Decedent's estranged husband, Paul Sachs, passed on July 8, 2011. Tr. 20:8-12. He left behind a trust for each of his children, which provided a monthly payout and the option of a lump sum on each child's 55th birthday. *See* Tr. 26:8-12, 220:8-16.

[14] Tr. 226:10-12. *See also* Tr. 218:22-24, 222:14-16.

[15] *See* Tr. 86:15-22. *See also* Tr. 246:13-16.

[16] JX47.

[17] JX6. Caren has not, however, confirmed where she received the funds for this deposit.

[18] Tr. 119:2-7; JX23.

[19] Tr. 229:1-11; JX23, JX62. Lynne objects to pages within JX62, because Caren failed to produce them during discovery. Caren argues JX62 was included in the pretrial stipulation, D.I. 113. Upon review of the pretrial stipulation, I cannot locate a proposed exhibit that matches JX62; thus, I find the challenged pages should not be admitted.

back, that [Caren] would deduct the amount that [she] paid for the cemetery from the $50,000 that [she] owed [the Decedent], and [the Decedent] said that was fine."[20]

Caren's name was added to the PNC Account two months later, on December 17, 2014.[21] The account registration and agreement continued to reflect "Individual/sole proprietor" and contained no language regarding the right of survivorship.[22] Caren testified that she was added to the PNC Account solely to help the Decedent manage her affairs.[23] Adding Caren's name, per Caren, gave her flexibility to manage the Decedent's assets and pay the Decedent's bills on her behalf.[24]

## B.     The Certification in 2015

After an injury at her home in early 2015, the Decedent was hospitalized.[25] The Decedent then spent approximately two months as a resident of FutureCare Courtland, an assisted skilled living facility in Baltimore, Maryland.[26] There she was diagnosed with a variety of issues: UTIs, kidney disorder, heart disease, hearing

---

[20] Tr. 373:24-374:3.

[21] JX47.

[22] *Id.*

[23] Tr. 245:18-20.

[24] Tr. 248:17-20.

[25] *See* Tr. 20:22-24.

[26] Tr. 189:8-18.

issues, sights issues, and mental decline.[27]  Ultimately, on February 15, 2015, the Decedent was diagnosed with vascular dementia.[28]

Then, on February 16, 2015, Dr. Tonya Hardy-Jones executed a certification of incapacity reflecting her determination that the Decedent was, at that time, "incapable of making an informed decision regarding treatment."[29]  The certification provides:

> Incapable of making an informed decision means the inability of an adult patient to make an informed decision about the provision, withholding, or withdrawal of a specific medical treatment or course of treatment because the patient is unable to understand the nature, extent, or probable consequences of the proposed treatment, is unable to make a rational evaluation of the burdens, risks, and benefits of the treatment, or is unable to communicate a decision.[30]

This certification was noted in the progress notes of Dr. Andrew Speer who saw the Decedent on February 17, 2015 and found her "[n]ot oriented to place or time."[31]

The Decedent's condition did not improve, and she was often in and out of the hospital and various facilities.  During one trip to the hospital, on March 9, 2015, the Decedent executed a power of attorney, naming Caren as her agent.[32]  Thereafter,

---

[27] Tr. 189:19-190:17.

[28] Tr. 186:21-187:3.

[29] JX36.

[30] *Id.*

[31] *Id.*

[32] D.I. 107, p.3.

7

the Decedent moved to an assisted living facility called Sunrise, located in Baltimore, Maryland.[33] But, per Caren, the Decedent was not happy at Sunrise; "she didn't fit in, she didn't want to participate in any of the activities."[34] Thus, the Decedent left Sunrise in October 2015.[35]

After her brief stay at Sunrise, the Decedent returned home and lived alone, with part-time assistance.[36] December 8, 2015, Steven's 55th birthday came and went without repayment from Steven on the Promissory Note. But Caren, as attorney-in-fact, decided not to pursue Steven. Caren testified, "I did nothing because I didn't think it was advisable for me as a steward of my mother's finances to pursue my brother when he didn't have any money."[37] But Caren admitted her belief that Steven was entitled to "a significant distribution from a trust," which she "suppose[s]" could have been used to pay the Promissory Note.[38]

Approximately three (3) months after she left Sunrise and returned home, the Decedent, on January 29, 2016, executed her last will and testament (the "Will"), addressed further below.[39] Then, around May or June of 2016, the Decedent moved

---

[33] Tr. 21:4-6.

[34] Tr. 310:8-15.

[35] Tr. 21:9-11.

[36] Tr. 21:9-11.

[37] Tr. 231:15-18.

[38] Tr. 234:7-12.

[39] D.I. 107, p.3; JX7.

8

in with her son, Steven in Pikesville, Maryland.[40]  The parties dispute why the Decedent moved—Lynne and her husband testified the Decedent was taken from her home against her wishes, but Caren contends the Decedent wanted to move in with Steven.[41]

### C.    Living With Steven

While at Steven's house, the Decedent stayed in a converted office (previously a garage).[42]  Her room was separated from the main house, and the Decedent had to walk through a corridor, or breezeway, to reach a bathroom and kitchen in the main house.[43]   The parties dispute whether this was a safe and comfortable living arrangement for the Decedent.[44]  Caren had no concerns and testified that she visited the Decedent every week while the Decedent lived with Steven.[45]  Per Caren, the Decedent's "apartment, so to speak, was the same . . . every time [she] went."[46]

But on July 28, 2017, Steven's house was searched on suspicion of illicit drug activities at the property, and the police found concerning items in the Decedent's

---

[40] Tr. 21:9-11.

[41] Tr. 31:9-21, 305:8-11.

[42] Tr. 21:12-15.

[43] Tr. 31:3-8, 196:22-24; JX34.

[44] Tr. 43:21-44:19, 306:4-11.

[45] Tr. 207:6.

[46] Tr. 307:20-21.

living area.[47]  By way of background, from May 2017 through July 2017, detectives with the Baltimore County Police Department received "multiple complaints of illicit drug activity" at Steven's house.[48]  They investigated, collected evidence, and secured a search and seizure warrant from the Baltimore County Circuit Court.[49]

Police executed the warrant on July 28, 2017 at 6:35 a.m.[50]  When they knocked, the door to Steven's house "swung open without anyone manipulating the door handle[,]" and upon entering police "could detect a strong odor" which they identified as marijuana.[51]  Police found the various residents of Steven's house, including the Decedent, in their respective rooms.[52]  Throughout the home and in each room, police found weapons, drugs, and drug paraphernalia.[53]  Most concerning, and relevant to this action, were the items found in the Decedent's room: (1) a handgun with magazine and ammunition, (2) two shotguns and a rifle, and (3)

---

[47] JX22.

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

a jar with brown oil.[54]  Luckily, the Decedent was not harmed or implicated in these discoveries.  But Steven, and other residents, were arrested on various charges.[55]

Shortly after the warrant was executed, Lynne and her husband received a copy of the police report and they scanned a copy to Caren, urging her to remove the Decedent from Steven's home.[56]  But, despite the concerning findings, and Lynne's insistence, Caren, as attorney-in-fact, did not move the Decedent; she remained in Steven's house.[57]  Caren explained that from May 2017 through October 2017, the Decedent "was declining and she couldn't hold a conversation as well as she used to be able to[.]"[58]  She was also frail and, in October 2017 she fell, fractured her hip, and was hospitalized.[59]  After two months of treatment and rehabilitation, the Decedent was discharged and she moved in with Caren, in New Castle, Delaware, on December 24, 2017.[60]

---

[54] *Id.*

[55] *Id.*

[56] Tr. 44:10-13.  Lynne's husband, Kenneth Lawrence, testified that he was prepared to pick the Decedent up and move her down to live in his home, but Caren convinced the Decedent not to go.  Tr. 46:6-24.

[57] Per Caren, "[t]hat was [the Decedent's] choice." Tr. 201:20.

[58] Tr. 319:2-15.

[59] Tr. 21:15-18.

[60] Tr. 203:22-24,

**D.    Living With Caren**

When the Decedent first moved into Caren's home, "she was very grateful. She was happy to be somewhere where people loved her and welcomed her and she was always very thankful."[61]   Initially, the Decedent slept in a second-floor guest room.[62]   But Caren testified that she spent $24,000.00 to $25,000.00 to renovate her garage into a "little apartment" for the Decedent.[63]   Per Caren, the renovations were complete "around the end of January of 2018" and the Decedent "loved it."[64]

Despite the improved living situation in 2018, the Decedent, as she declined mentally and physically, "became combative"; per Caren, she was "unwilling to do certain things, like she didn't really want to eat."[65]   Then, the Decedent fell and was injured in March of 2018.[66]

The Decedent continued to decline in 2019; "she wasn't able to chew," "[s]he would sleep all the time[,]" and "[s]he wouldn't acknowledge unless you . . . prodded

---

[61] Tr. 290:18-20.  Per Caren, the Decedent wished to contribute towards the household expenses but did not formally pay rent, nor a salary to Caren for the caregiving she provided. Tr. 343:3-17.

[62] Tr. 299:18-20.

[63] Tr. 299:4-300:23.

[64] Tr. 300:7-11.

[65] Tr. 290:21-291:8.

[66] Tr. 55:2-11.  On or around April 28, 2018, Caren and the Decedent were in a car accident, where Caren was found at fault, and the Decedent was injured. *See* JX16, Tr. 59:11-13. Any claims were settled and, although Lynne initially challenged the settlement, she requested no relief related thereto in her post-trial briefing. *See* JX18.

12

her to get up and to just move around."[67]  Per Caren, from 2019 through her death, the Decedent "just really kind of wasn't there."[68]  Ultimately, the Decedent passed on February 23, 2020, shortly after her 89th birthday.[69]

### E.    The Estate

On April 27, 2020, Lynne was appointed as the administrator of the Decedent's estate and issued letters of administration.[70]  Lynne was not, however, the named executor in the Will.[71]  In the Will, the Decedent nominated her nephews as executor and successor executor, but neither opened an estate.[72]  Without the named executors, the Register of Wills, upon Lynne's petition, accepted the Will for probate and appointed Lynne to administer it.[73]

---

[67] Tr. 291:14-24.

[68] Tr. 335:22-23.

[69] Tr. 20:14, 335:1-2.

[70] JX4.

[71] JX7.

[72] *Id.*; *In the Matter of Doris Yetta Sachs*, ROW 174472 KL-SEM ("ROW") D.I. 5. "Because the Register of Wills is a Clerk of the Court of Chancery, filings with the Register of Wills are subject to judicial notice." *Arot v. Lardani*, 2018 WL 5430297, at *1 n.6 (Del. Ch. Oct. 29, 2018) (citing 12 *Del. C.* § 2501; Del. R. Evid. 202(d)(1)(C)).

[73] ROW D.I. 5. On July 17, 2020, Caren filed a petition to remove Lynne as administrator under 12 *Del. C.* § 1541. C.A. No. 2020-0592-SEM.  Lynne moved to dismiss, I recommended that motion be granted, and my recommendation was adopted by then-Chancellor Bouchard; thus, that action was closed on or around January 26, 2021. *See* C.A. No. 2020-0592-SEM, D.I. 7, 18-20.

13

Through the Will, the Decedent expressed her intention that her estate pass in equal shares to her three children, except for (1) a diamond ring specifically bequeathed to Lynne, (2) any property "jointly in the names of [the Decedent] and any other person with the right of survivorship, but excluding any tenancy in common, [which] shall pass by right of survivorship or operation of law" outside the probate process, and (3) that "[t]he bequest to each child . . . shall be reduced by the amount of any indebtedness owed to [the Decedent] by such child at the time of [her] death including interest thereon[.]"[74]

In her capacity as administrator, Lynne has filed an inventory and first accounting.[75] But Lynne has been unable to marshal all the Decedent's assets; since the Decedent's death, and despite Lynne's appointment as administrator, Steven and Caren have failed to turn over the Decedent's personal property to the estate, through Lynne as administrator.[76]

In addition to this probate dispute, Lynne also testified that Steven and Caren interfered with her interest in the Decedent's life insurance. The Decedent had a life insurance policy with Protective Life Insurance, for which she named all three of her

---

[74] JX7, Item III-V.

[75] ROW D.I. 12, 16.  Caren filed exceptions to the accounting, which remain pending on the Register of Wills docket. ROW D.I. 23.

[76] See Tr. 280:2-16.  Caren testified that she brought a diamond ring to trial and offered to provide it to Lynne; I expect that exchange occurred after trial concluded. See Tr. 280:11-16, 408:3-14.

children as beneficiaries.[77]  Caren and Steven received their share; Lynne did not.[78]

Per Lynne's husband, the insurance company "sent Lynne's check to Steven."[79]

### F.    The Finances

As addressed above, Caren became the Decedent's attorney-in-fact on March 9, 2015.  In that capacity, she had access to, and control over, the Decedent's bank accounts and other property.  Those accounts included the PNC Account, two accounts with Capital One (the "Capital One Accounts"), and annuity(ies).[80]  Only after the Decedent's death and through this action did information on Caren's handling of those assets come to light.[81]

From October 2015 to October 2019, Caren withdrew a total of $138,898.00 in cash from the PNC Account.[82]  Cash withdrawals were made nearly every week

---

[77] JX57. *See also* Tr. 81:13-15.

[78] JX57.

[79] Tr. 82:7.

[80] *See* JX12 (summarizing these accounts in detail and noting uncertainty if an annuity reflected in one of the Capital One Accounts was the same as the Decedent's annuity with Lincoln Financial, for which Caren did not provide any documentation).

[81] The service of the AAL, as defined below, was essential to making sense of the Decedent's finances and Caren's conduct. *See* JX12.

[82] Tr. 266:5-15; JX30.  Caren admitted that she completed each withdrawal ticket, the handwriting is hers, and she received the money withdrawn. Tr. 265:14-22; JX30.  Caren further admitted that she did not keep any record of the cash expenditures. Tr. 268:20-23. Per Caren, she "didn't think it was necessary to keep an accounting[.]" Tr. 270:18-20. She "didn't feel the need to" even write in the memo line a note of the purpose of the cash withdrawals. Tr. 270:21-24.

during this time and ranged from $100.00 to $3,500.00 at a time.[83] From November 2019 to the Decedent's death, Caren withdrew an additional $12,380.80 from the PNC Account.[84] The date-of-death value of the PNC Account was "$110,130.07 + 1.97 accrued interest."[85]

Caren testified that these cash withdrawals were used for the Decedent's care.[86] But Caren admitted that she did not keep records showing how she used the Decedent's funds.[87] In lieu of receipts, Caren attempted to provide a narrative explanation of her expenditures. When the Decedent lived with Steven, Caren explained that she would rely on Steven to tell her the amount due to caregivers, she would then take the cash out, and she would provide it directly to Steven.[88] Notably, she did not independently confirm the amount due or that payment was made to any care providers.[89] And Caren continued this practice even after Steven's arrest.[90]

---

[83] JX30.

[84] Tr. 269:13-270:14.

[85] JX47.

[86] Tr. 272:14-21.

[87] Tr. 216:9-11. This lack of recordkeeping is even more troubling considering Caren's professional experience as the sole owner, investor, and proprietor of her business. *See* Tr. 205:14-208:1, Caren testified, however, that she was unaware of the need to keep records of her transactions as attorney-in-fact. Tr. 211:1-7. This testimony could, perhaps and to some extent, be credited toward the transactions before this action was filed but by at least July 23, 2018 (when this action was filed), Caren's asserted ignorance is unbelievable.

[88] Tr. 272:14-273:5, 314:1-8.

[89] *Id.*

[90] Tr. 320:18-23.

After the Decedent moved into Caren's home, Caren used cash to directly pay caregivers, but, like the process with Steven, she kept no receipts of those payments.[91]

But Caren was not only transacting in cash. Caren also utilized the Decedent's credit card (the "Discover Card") and paid for those charges with the Capital One Accounts.[92] Between October 2017 and April 2019, Caren paid $19,542.69 in Discover Card bills.[93] In 2020, Caren also liquidated a savings bond(s) belonging to the Decedent.[94] Per Caren, the bond(s) were liquidated for a total of $4,277.20 and she deposited that amount into the PNC Account.[95] But that figure is listed on a form from PNC Bank as the total interest earned on the Decedent's bond(s) during the year 2020; this interest figure implies the overall value was much higher.[96]

Caren also, in her capacity as attorney-in-fact, liquidated some of the Decedent's real and personal property. In 2017, Caren, as attorney-in-fact, listed the House for sale and in August 2018 the House sold for $269,000.00.[97] Before the sale, Caren cleared out the personal property in the House herself and with the help

---

[91] Tr. 323:20-325:3.

[92] Tr. 77:9-78:21.

[93] JX12, p.18.

[94] Tr. 278:24-279:5.

[95] *Id.*

[96] JX54.

[97] Tr. 327:17-18, 330:17-19, 394:4-6.

of a company.[98]   After the sale, Caren deposited $211,443.92 into the PNC Account.[99]   Caren contends these are the full sale proceeds; she has not, however, provided any documentation in support.[100]

In 2018, Caren, as attorney-in-fact, sold the Decedent's Kia (the "Vehicle") to herself for $1.00.[101]   She testified inconsistently regarding why and how this transaction occurred.  First, Caren explained: "I put it in my name after realizing and finding out that I couldn't get insurance in [the Decedent's] name because she wasn't the driver[.]"[102]   Then she changed her story, testifying that the transfer was the Decedent's idea: "she had eventually said to me that she had wanted my son to have it, and so she couldn't drive it any longer, so she said why don't you just buy it from me."[103]   Then, in her third iteration, Caren testified that the Decedent "promised" the Vehicle to Caren's son.[104]   Caren confirmed that after the Vehicle was sold to her,

---

[98] Tr. 327:24-328:10. Lynne testified that she still had personal property in the house when it was cleared out and was not provided with notice or the opportunity to collect those belongings before the clean out and sale. Tr. 157:14-158:1.

[99] D.I. 107, p.3.

[100] Tr. 331:5-7.

[101] *Cf.* Tr. 237:21 ("she sold it to me"), 325:4-12.

[102] Tr. 367:20-23.

[103] Tr. 368:9-12.

[104] Tr. 238:11-14.

she gave it to her son, but he later "got rid of it."[105] But Caren also admitted that she used the Decedent's funds to pay for insurance on the Vehicle after the sale.[106]

Caren admitted that, after the Decedent's death, she closed the PNC Account and kept the entire date-of-death balance for herself.[107] Caren testified that she "believe[s] that [the PNC Account] was bequested [*sic*] to [her.]"[108] Caren confirmed, however, that she does not recall any of her personal money being deposited into the PNC Account and that interest on the account would have been declared solely on the Decedent's tax returns.[109]

### G. Procedural Posture

On July 23, 2018, before the Decedent's death, Lynne filed a verified petition to remove Caren as the Decedent's attorney-in-fact and compel Caren to account for her stewardship of the Decedent's property.[110] Discovery stalled, and on May 20, 2019, I granted Lynne's motion to compel Caren to produce documents and supplement or amend her interrogatory responses; finding Caren's discovery

---

[105] Tr. 368:22-24.

[106] Tr. 348:3-10, 392:11-14. *See also* JX17, 55.

[107] Tr. 249:10-12.

[108] Tr. 249:18-19.

[109] Tr. 251:21-253:6.

[110] D.I. 1.

conduct was not substantially justified, I shifted fees in Lynne's favor, not to exceed $5,000.00, subject to further briefing.[111] Ultimately, I awarded Lynne $2,213.75.[112]

Thereafter, on May 24, 2019, I heard and ruled on Lynne's motion for interim relief, which I granted in part and denied in part.[113] Therein, I denied Lynne's requests for (1) removal of Caren as attorney-in-fact and (2) an order compelling Caren to repay certain expenditures to the Decedent.[114] I granted, however, Lynne's request for the appointment of an attorney advocate for the Decedent, to investigate Caren's service as the Decedent's attorney-in-fact, including the financial and care aspects of that service, and also to advocate on the Decedent's behalf to this Court.[115]

The parties agreed to the appointment of Kashif Chowdhry, Esquire (the "AAL") as attorney *ad litem* and I appointed him to that role on June 27, 2019.[116] I would be remiss not to thank the AAL for his service; he served the Decedent admirably, conducted a thorough investigation, and distilled his findings into an incredibly helpful report, filed on January 10, 2020.[117] Therein, he noted his

---

[111] D.I. 28.

[112] D.I. 42.

[113] D.I. 33.

[114] *Id.*

[115] *Id.*

[116] *See* D.I. 40-41.

[117] The report was originally due in July 2019, but that deadline was extended at the AAL's request and in light of ongoing settlement discussions. *See* D.I. 53. On May 18, 2020, I approved the AAL's fees in the total amount of $28,734.05, to be considered a debt of the

concerns "relating to the management and use of [the Decedent's] financial assets," and observation that the Decedent appeared to be receiving appropriate care.[118]

He recommended, at a minimum, an accounting from Caren for all accounts and transactions.[119] He also "push[ed] Caren to pursue an action against Steve[n] for the [Promissory Note] reminding her that she did owe fiduciary duties as [the Decedent's] attorney-in-fact to pursue such amounts."[120] After I reviewed the AAL's report, I directed the parties to confer on scheduling and set a three-day trial for June 22-24, 2020.[121]

But shortly thereafter the Decedent passed, and the course of these proceedings shifted. On April 13, 2020, Lynne moved to amend her petition; I granted that motion on May 18, 2020 and raised concerns about the impending trial.[122] The parties agreed that trial should be postponed, and it was removed from the Court's calendar.[123] In Lynne's amended petition she pled a caveat against the Will and claims for undue influence, lack of capacity, breach of fiduciary duty,

---

Decedent's estate, without prejudice to any future application(s) to reassess these fees against any party for bad faith litigation conduct or other justification(s) for fee shifting. D.I. 66. No such requests have been made.

[118] JX12.

[119] *Id.*

[120] *Id.* at p.20.

[121] D.I. 54-55.

[122] D.I. 58, 65.

[123] D.I. 68.

21

invalidation of beneficiary designations or retitling of accounts, an accounting, and unjust enrichment.[124]

Then, on July 30, 2020, Lynne filed a new action, initiated by a petition for instructions in her capacity as administrator of the estate, seeking permission to charge the Promissory Note against Steven's share, and the $50,000.00 loan against Caren's share, of the Decedent's estate or, alternatively, for judgment against them.[125] On July 9, 2021, Lynne moved to consolidate the related actions; I granted that motion on August 25, 2021.[126]

After consolidation, I entered a schedule setting this matter for a three-day trial during the first week of August 2022.[127] Steven did not attend the trial and default judgment was entered against him.[128] Ultimately, the parties only needed two (2) days: August 1 and August 3, 2022.[129] After trial, the parties submitted post-trial briefs and this matter is now ripe for my consideration.[130]

---

[124] D.I. 69.

[125] 2020-0632-SEM, D.I. 1.

[126] D.I. 77. I also denied Steven's motion to dismiss the second action. 2020-0632-SEM, D.I. 17.

[127] D.I. 79. *See also* D.I. 88.

[128] Tr. 3:22-4:4.

[129] D.I. 119-120. Before trial, I ruled on various pretrial motions. D.I. 99, 114, 116

[130] D.I. 128, 130, 131.

## II.    ANALYSIS

Before trial, Lynne withdrew her will contest.  And rather than pressing for an accounting, Lynne argues that Caren should be held to the insufficient support she provided in discovery and trial and found liable for all unaccounted-for transactions.  Thus, the following claims remain: (1) breach of fiduciary duty against Caren, (2) the invalidation of certain beneficiary designations and retitling of accounts, (3) repayment or return of debts owed by, and property in the possession of, Steven and Caren, and (4) a request for bad-faith fee shifting.[131]

I address first the claims against Steven, excluding the request for fee shifting. Then I turn to the claims against Caren, followed by the claims for invalidation of certain beneficiary designations and retitling of accounts.  Finally, I address the requests made against both Steven and Caren for (1) return of assets of the estate and (2) fee shifting.

### A.    Judgment should be entered against Steven and in favor of the estate.

Lynne seeks judgment against Steven for (1) the unpaid Promissory Note and (2) life insurance proceeds.[132]  Judgment would be in favor of the estate (payable

---

[131] Tr. 5:11-12. In post-trial briefing, Lynne did not separately argue her unjust enrichment claim; rather the argument was woven into many claims as further support for the relief requested. *See, e.g.*, D.I. 128, p.43.

[132] Caren "is in agreement with a judgment being entered against Steven in the amount of the [P]romissory [N]ote, and if recovered, agrees that the amount is to be placed into [the

23

first from Steven's share of the estate) and Lynne, respectively. I address these requests in turn.

I start with the Promissory Note. Therein, Steven acknowledged that he "did in fact borrow $131,400" from the Decedent and promised to repay the full amount "no later than [his] 55th birthday on December 8, 2015."[133] He did not keep his promise and the Promissory Note remains unpaid. Under 12 *Del. C.* § 510, "[a] debt owed to the decedent is charged against the intestate share of the debtor." Further, under the Will, the Decedent expressly provided that "[t]he bequest to each child . . . shall be reduced by the amount of any indebtedness owed to [the Decedent] by such child at the time of [her] death including interest thereon[.]"[134] These provisions support judgment against Steven, in favor of the estate, payable first from Steven's share of the estate. Judgment should be entered in the amount of $131,400.00, plus pre- and post-judgment interest beginning on December 8, 2015.[135]

---

e]state." D.I. 130, p.27. Caren does not, however, take any position regarding Lynne's remaining requests for relief against Steven. *Id.*

[133] JX5.

[134] JX7, Item III-V.

[135] *See Soterion Corp. v. Soteria Mezzanine Corp.*, 2013 WL 869353, at *2 (Del. Ch. Mar. 7, 2013) (finding "quarterly compounding is both reasonable to maintain the value of the interest that is awarded and to incentivize payment"); *Dweck v. Nasser*, 2012 WL 3194069, at *6 (Del. Ch. Aug. 2, 2012) ("Pre-judgment and post-judgment interest is due on all amounts at the legal rate, compounded quarterly.").

I turn now to the life insurance payout. During trial, Lynne built a record demonstrating that the Decedent had a life insurance policy, payable in equal shares to her three (3) children. The record also reflects that Steven and Caren received their portion of the insurance, but Lynne did not. But I find Lynne has not proven that Steven, more likely than not, received Lynne's share and should be held liable therefor. Further, it does not appear that Lynne pled this claim in the underlying pleadings, nor is this issue identified within the issues of fact or law or relief sought in the pretrial stipulation.[136] It was raised for the first time in post-trial briefing. Thus, I find the request should be denied.[137]

### B. The claims against Caren should be granted in part and denied in part.

I find Caren owed and breached her fiduciary duties to the Decedent and recommend appropriate remedies to make the Decedent whole. I further find Caren should be directed to prepare a formal accounting before this Court entertains whether she should be held liable for the currently unaccounted-for expenditures or the Loan.

---

[136] D.I. 69; D.I. 113.

[137] *Cf.* Ct. Ch. R. 15(b) (permitting amendments to conform to the evidence when tried with express or implied consent of the parties or upon a motion to amend).

"A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[138] The Plaintiff must prove these elements by a preponderance of evidence.[139]

> [P]roof by a preponderance of the evidence means that something is more likely than not. By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, [Lynne loses]. In the context of . . . self-dealing[, if Lynne] carries that burden, then the burden shifts to [Caren] to demonstrate that the dealings were entirely fair.[140]

The burden to prove fairness "increases significantly where . . . there is a transfer for no consideration."[141]

Caren concedes the first element—that she owed fiduciary duties to the Decedent as early as December 19, 2014.[142] Thus, I focus my inquiry on whether she breached those duties in connection with the following (all of which occurred after December 19, 2014): (1) the sale of the Vehicle and reimbursement for

---

[138] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010) (citations omitted).

[139] *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002).

[140] *In re Happy Child World, Inc.*, 2020 WL 5793156, at *10 (Del. Ch. Sept. 29, 2020) (citations and quotation marks omitted).

[141] *Coleman v. Newborn*, 948 A.2d 422, 432 (Del. Ch. 2007) (citations omitted).

[142] Caren provides in her post-trial briefing: "Caren does not contest that she became a common law fiduciary for [the Decedent] as of December 19, 2014, when she was added to [the Decedent's] PNC account and given access to assist [the Decedent] with her finances, and a formal fiduciary of [the Decedent] when [the Decedent] executed the POA document appointing Caren to that role on March 9, 2015."D.I. 130, p. 9 *See also* Tr. 208:5-8.

insurance for the Vehicle after the sale; (2) the sale of the House; (3) the unpaid Promissory Note; and (4) the lack of receipts and invoices for Caren's transactions as attorney-in-fact.

**1.**      **The sale of the Vehicle and insurance reimbursements were self-dealing transactions, and Caren has failed to prove they were entirely fair.**

"[S]elf-dealing occurs when the fiduciary has a 'personal interest in the subject transaction of such a substantial nature that it *might* have affected [her] judgment in material connection.'"[143] "An attorney-in-fact who uses the power given to [her] by the principal to transfer assets to [her]self has committed improper self-dealing, absent the voluntary and knowing consent of the principal."[144] A self-dealing transaction is, thus, voidable "[u]nless the principal obtains independent advice from a competent and disinterested third party and consents after full disclosure[.]"[145]

---

[143] *Stegemeier v. Magness*, 728 A.2d 557, 564 (Del. 1999) (emphasis in original, citations omitted).

[144] *Pennewill v. Harris*, 2011 WL 691618, at *3 (Del. Ch. Feb. 4, 2011). *See also Schock v. Nash*, 732 A.2d 217, 225 (Del. 1999) ("An attorney-in-fact, under the duty of loyalty, always has the obligation to act in the best interest of the principal unless the principal voluntarily consents to the attorney-in-fact engaging in an interested transaction after full disclosure.") (citations omitted).

[145] *Mitchell v. Reynolds*, 2009 WL 132881, at *10 n.82 (Del. Ch. Jan. 7, 2009) (citing *Coleman*, 948 A.2d at 429).

The level of disclosure and consent required to save a self-dealing transaction was addressed by this Court in *Coleman v. Newborn*.[146] There, a principal of a power of attorney "signed a quitclaim deed giving her house, her only substantial asset, to" her attorney-in-fact.[147] The principal sued to unwind the transaction and Vice Chancellor Lamb, following a bench trial, held "although the power of attorney was not used to effect the gratuitous transfer and although there is no clear evidence that [the attorney-in-fact] exerted undue influence in connection with the transfer, equity nevertheless require[d] that the deed be set aside to protect the interests of the [principal]."[148] Vice Chancellor Lamb found the transaction was unfair and the principal did not voluntarily and knowingly consent, even though the principal was advised by counsel and personally signed the deed. Vice Chancellor Lamb explained that counsel "did not provide the level of counsel necessary to validate the transfer" and "the legal function performed by [counsel was] insufficient to warrant upholding the transfer."[149]

Here, Caren sold the Vehicle to herself for $1.00. And after the sale, Caren reimbursed herself for payments made toward insurance for the Vehicle. Caren had

---

[146] 948 A.2d 422 (Del. Ch. 2007).

[147] *Coleman*, 948 A.2d at 423.

[148] *Id.*

[149] *Id.* at 430, 432.

a personal interest in these transactions, rendering them self-dealing and voidable at the behest of Lynne, the administrator of the Decedent's estate.

Thus, the burden shifts to Caren to prove the Decedent voluntarily and knowingly consented to these transactions. She failed to meet this burden. Even if I accept Caren's conflicting testimony that the Decedent wanted the Vehicle to go to Caren's son and that Caren used the Vehicle after the sale to care for the Decedent, Caren has failed to demonstrate that the Decedent received "independent advice from a competent and disinterested third party and consent[ed] after full disclosure" of the terms of these transactions.[150] It is not even clear if the Decedent knew of these transactions before they occurred such that she could consent. And these transactions happened at a time where the Decedent was substantially declining and may not have had capacity to so consent. On this record, I find the sale of the Vehicle and insurance payments were self-dealing transactions that should be declared void.

This declaration calls for additional remedies to unwind the self-dealing transactions. But there are inherent difficulties in doing so. Per Caren's testimony, the Vehicle is no longer in her possession, nor her son's. It is unclear where the Vehicle is now and there is no evidence regarding the value of the Vehicle when it was sold to Caren. Thus, I cannot compel a return to the estate nor impose monetary

---

[150] *Mitchell*, 2009 WL 132881, at *10 n.82 (citing *Coleman*, 948 A.2d at 429).

damages.  I can, however, calculate the improper insurance payments and find judgment should be entered against Caren, and in favor of the Decedent's estate for, $2,123.58.

> **2.    Caren did not breach her duties in connection with the sale of the House but should be required to account for the full sale price.**

Caren testified that she listed the House for sale, cleaned it out herself and with professional assistance, and ultimately sold the House for $269,000.00.  But only $211,000.00 was deposited into the PNC account.  The PNC Account was eventually liquidated, which I address below. In this section, I address whether Caren breached her fiduciary duties to the Decedent by (1) clearing out the property, (2) failing to account for the difference between the sale price and the amount deposited into the PNC Account, and (3) depositing the sale proceeds, at least in part, into the PNC Account, which was a jointly titled account.

First, Lynne argues part of Caren's clean out of the House, included "property belonging to Lynne.  No effort was made to contact Lynne to give her an opportunity to take her property or preserve it for her until she had an opportunity to do so. It is presumed that Caren simply threw away Lynne's property."[151]  But Lynne has failed

---

[151] D.I. 128, p.28 (citations omitted).

30

to connect these complaints to a duty Caren owed to the Decedent.  Without a duty and corresponding breach, this argument fails.

Second, Lynne argues that Caren has failed to account for the discrepancy between the sale price and proceeds deposited.  I find this deficiency does not raise to a breach of fiduciary duties, but Caren should be required to account for the sale proceeds in full, as further explained below.

Finally, Lynne argues that Caren breached her duty of loyalty by depositing the sale proceeds into the PNC Account, which she later liquidated.  This mirrors the argument presented to then-Master Glasscock in *Pennewill v. Harris*.[152]  There, then-Master Glasscock was asked: "is it a breach of duty for an attorney-in-fact . . . to place the proceeds of the sale [of the principal's home] into an account of which [the attorney-in-fact] is a joint owner?"[153]  His answer was "yes."  In so holding, he explained: "*Schock v. Nash* makes it clear that [an agent's] conversion of the proceeds of the sale of [a principal's solely-owned property] into joint property [also owned by the agent] amount[s] to impermissible self-dealing."[154]

But, as explained below, I find the PNC Account was never a joint account and Caren's name was only added for convenience purposes.  Absent that finding,

---

[152] 2011 WL 691618, at *3.

[153] *Id.*

[154] *Id.*

the reasoning in *Pennewill* and *Schock* would apply. But, because I find the PNC Account was never a joint account, Caren's deposit of the sale proceeds into that account was not self-dealing, nor a breach of duty.

### 3. Caren breached her duties in connection with the Promissory Note.

Caren admitted that she did not pursue payment of the Promissory Note and attempted to explain why such pursuit would be fruitless. But I find her explanation hollow; Caren had a conflict of interest given her close relationship with Steven and she failed to put the Decedent's interests above Steven's.

As attorney-in-fact, Caren had, among other duties, "the duty to act in accordance with the principal's reasonable expectations and in the principal's best interest;" and "to not create conflicts of interest[.]"[155] Lynne has proven, by a preponderance of the evidence, that Caren breached these duties.

The parties testified consistently that the Promissory Note was the product of a family meeting with the Decedent and her children. After the meeting, it is more likely than not that the Decedent had a reasonable expectation that Steven would fulfill his promise. The promise was not, as Caren seems to argue, illusory; Steven was expected to receive trust funds sufficient to satisfy the Promissory Note. When Steven failed to pay, the Decedent was short $131,400.00; her best interest, which

---

[155] *Tikiob v. Tikiob-Carlson*, 2021 WL 4310513, at *4 (Del. Ch. Sept. 22, 2021) (citations and quotation marks omitted).

Caren should have acted in accordance with, was to collect that debt. Rather than act on those reasonable expectations and best interest, I find Caren allowed her personal relationship with Steven to outweigh the interest of the Decedent in collecting on her debts. Caren's unsupported and self-serving testimony that the Decedent agreed with non-collection is unpersuasive.[156]

I find Caren breached her fiduciary duty to the Decedent by failing to pursue repayment of the Promissory Note. The damage caused by her breach will, at least in part, be remedied by judgment against Steven; otherwise, Lynne does not request further relief in connection Caren's failure to pursue payment.

### 4. Caren breached her duties by failing to maintain, and disclose to Lynne, sufficient records.

I find Caren breached her fiduciary duty of care by failing to maintain receipts and invoices in support of transactions and purchases made with the Decedent's funds. She further breached her duties under 12 *Del. C.* § 49A-114(g), when she failed to disclose receipts, disbursements, or transactions to Lynne upon request.

Caren was required to keep records "of all receipts, disbursements, and transactions made on behalf of the [Decedent]."[157] She was further required to "disclose receipts, disbursements, or transactions conducted on behalf of the

---

[156] *See* Tr. 233:10-14.

[157] 12 *Del. C.* § 49A-114(b)(4).

33

[Decedent]" to Lynne, as administrator of the Decedent's estate, "within a reasonable period of time" after Lynne requested such information.[158] Caren admitted multiple times at trial that she failed to maintain any receipts or records other than the electronic bank records showing that cash was withdrawn or purchases were made. The record also reflects that Caren was evasive during discovery and did not disclose receipts, disbursements, or transactions to Lynne within a reasonable time after Lynne's requests.[159] Thus, Caren breached her fiduciary duty.

Lynne argues that, as a remedy, I should enter judgment against Caren for the unaccounted-for expenditures and impose a constructive trust and equitable lien on all property traceable to the Decedent's funds. "This court has broad discretion to fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages."[160] But, on the record before me, I find the requests for judgment, a constructive trust, or equitable lien should be denied, without prejudice to renew after Caren provides a formal accounting.

---

[158] 12 *Del. C.* § 49A-114(g).

[159] Caren argues that she did not breach her duty by failing to produce records in this action because Lynne was not the administrator when the action was commenced. D.I. 130, p.25-26. But Lynne has been serving as administrator since April 27, 2020, nearly three (3) years now, and Caren has steadfastly refused to provide the statutorily required materials throughout that tenure.

[160] *Deane v. Maginn*, 2022 WL 16557974, at \*20 (Del. Ch. Nov. 1, 2022) (citations and quotation marks omitted).

Lynne seeks "a constructive trust on all property, or the proceeds therefrom, received by Caren, including but not limited to, the balance of the PNC [Account], which Caren inappropriately liquidated and took for herself as well as any proceeds from the liquidation of [the Decedent's] savings bonds in favor of the [e]state."[161] I address the liquidation of the PNC Account below. But "[a] constructive trust cannot be imposed upon the proceeds . . . [which] do not remain in an identifiable account."[162] Here, there is no identifiable account for the liquidated savings bonds and, thus, I find a constructive trust an inapt remedy to address those liquidations.

Lynne seeks an equitable lien over "all property owned by Caren which is traceable from any of [the Decedent's] assets[.]" "A principal reason for impressing an equitable lien is to prevent unjust enrichment, i.e., where it would be contrary to equity and good conscience for an individual to retain a property interest acquired at the expense of another."[163] I address this request as it relates to the PNC Account and personal property below. Other than the PNC Account, though, Lynne has not demonstrated that Caren presently and unjustly retains a property interest traceable to the Decedent's funds. Thus, this request should be denied without prejudice to renew after the accounting recommended herein.

---

[161] D.I. 128.

[162] *Nash v. Schock*, 1997 WL 770706, at *6 (Del. Ch. Dec. 3, 1997).

[163] *Branca v. Branca*, 443 A.2d 929, 931 (Del. 1982) (citations omitted).

Finally, I find that judgment against Caren for the unaccounted-for expenditures would be premature. I find *In re Estate of Dougherty*[164] analogous. There, Judge LeGrow, sitting by designation in this Court, directed an attorney-in-fact to prepare and serve a formal account. Like Caren, the attorney-in-fact in *Dougherty* failed to maintain records, "made no effort to obtain bank records or copies of receipts or bills from relevant entities or individuals[,] . . . offered no other evidence, such as affidavits from persons she claim[ed] to have paid in cash[,]" and merely relied on a "narrative account."[165] These deficiencies were evident at trial and noted in the Court's post-trial decision. But rather than convert the absence of an accounting into a monetary judgment, as Lynne seeks here, Judge LeGrow held that the attorney-in-fact was required to provide a formal accounting.[166] Judge LeGrow explained "any question of damages must await the accounting and reconciliation of the expenditures [the attorney-in-fact] made."[167]

I hold the same here. Caren's discovery conduct was disappointing. Her unsupported testimony regarding her handling of the Decedent's finances was also unconvincing.[168] But before damages or other equitable relief can be assessed, Caren

---

[164] 2016 WL 4130812 (Del. Ch. July 22, 2016).

[165] *Id.* at *12.

[166] *Id.*

[167] *Id.* at *12 n.108.

[168] *See* Tr. 209:2-5.

should be required to prepare a formal accounting of her financial transactions as attorney-in-fact.[169]

The accounting period should be from December 19, 2014 through the date of the Decedent's death and should include (1) all bank accounts, including but not limited to the PNC Account and the Capital One Accounts and any annuities, (2) the sale proceeds from the sale of the House, and (3) the savings bonds. This accounting should also address the expenditures on the Discover Card and demonstrate the source of the funds used to repay the Loan.[170]

---

[169] *See Rambo v. Fischer*, 2022 WL 4180890, at *6 (Del. Ch. Sept. 13, 2022), *adopted sub nom. In re Orkin* (Del. Ch. 2022) ("Section 49A-114(g) is limited by its terms to permit a post-death request for an accounting 'by the personal representative or successor in interest of the principal's estate.' . . . [T]he limited exception requires an agent to account to the fiduciary of the decedent's estate or, if there is none, to the successor in interest of the decedent's estate.") (citations omitted).

[170] Lynne seeks judgment against Caren and in favor of the estate for the full amount of the Loan. Lynne argues that Caren has failed to prove that the lump sum payment toward the Loan was from Caren's personal funds, rather than the cash withdrawn from the PNC Account; Lynne also argues that the Burial Payment should not be credited. I agree with the latter. Caren testified that the Decedent agreed to accept the Burial Payment as repayment on the Loan, but this self-serving testimony is unpersuasive given the Decedent's substantial decline and Caren's equivocal testimony regarding the reason the Burial Payment was made in the first place. Tr. 372:8-13, 373:22-374:3. Thus, I find Caren should not be credited with the Burial Payment. I cannot, however, determine if the lump sum payment should be credited, in whole or part, until the accounting process plays out; if Caren can demonstrate where the cash went, the argument that the cash went toward the lump sum would fail. Thus, I find the Loan payback should be included in the accounting phrase.

During this accounting phase, Caren will "bear[] the burden of proving both the accuracy of [her] accounting and the propriety of the underlying transactions."[171] I will hold her to that burden and assess appropriate damages, if requested by Lynne.

## C. The account-related requests should be granted in part and denied in part.

Lynne seeks (1) a declaration that Caren's name was added to the PNC Account as a convenience and, thus, the account is a probate asset and (2) retitling of certain non-probate assets such that they pass through the estate. I address these claims in turn.

### 1. Caren's name was added to the PNC Account as a convenience.

The parties dispute whether the PNC Account was a joint account, providing a right of survivorship to Caren, or a convenience account, which would pass through the estate as a probate asset.

The Delaware Supreme Court's decision in *Walsh v. Bailey* explains how this Court should analyze whether an account is a joint account with the right of survivorship or a convenience account.[172] Per *Walsh*, we start with the account's opening documents; if they are clear and unambiguous regarding survivorship, parol

---

[171] *Dolby v. Key Box "5" Operatives, Inc.*, 1996 WL 741883, at *1 (Del. Ch. Dec. 17, 1996).

[172] 197 A.2d 331 (Del. 1964).

evidence may not be admitted to show a different intent.[173] The clear and

unambiguous language recognized in *Walsh* was:

> JOINT ACCOUNT-PAYABLE TO EITHER OR SURVIVOR
>
> It is agreed and understood that any and all sums that may from time to time stand in this account, to the credit of the undersigned depositors, shall be taken and deemed to belong to them as joint tenants and not as tenants in common; while both joint tenants are living, either may draw and in case of the death of either, this Bank is hereby authorized and directed to deal with the survivor as sole and absolute owner thereof.
>
> It is especially agreed that withdrawals of funds by the survivor shall be binding upon us and upon our heirs, next of kin, legatees, assigns and personal representatives.
>
> Payment to or on check of the survivor shall be subject to the laws relating to inheritance and succession taxes and all rules and regulations made pursuant thereto.[174]

The *Walsh* court found the second paragraph above particularly instructive and

explained that "the meaning . . . seems clear. The complete tenor of the instruments

connotes a joint tenancy, not only by specific reference to such a relationship, but

also by outlining the consequences upon the 'heirs, next of kin, legatees, assigns and

personal representatives' which will flow from that relationship between the

parties."[175] Finding this language clear, the Delaware Supreme Court excluded the

---

[173] *Id.* at 333.

[174] *Id.* at 332 (cleaned up).

[175] *Id.*

contrary parol evidence and declared that the funds belonged to the surviving account holder.

Using the *Walsh* standard, this Court has found many account opening documents sufficiently clear to connote a right of survivorship without permitting parol evidence.[176] Conversely, *Matter of White* provides a helpful example of language that hints to joint tenancy in an ambiguous and non-conclusive manner:

> If the agreement is signed initially or subsequently by more than one person, the terms and conditions apply to each of the persons signing the agreement and to all of them, *jointly and severally, and all are jointly and severally obligated hereunder* and notice to any one of them shall constitute notice to all.[177]

Presented with this language, Chancellor Marvel admitted parol evidence to ascertain intent.[178]

Similarly in *Speed v. Palmer*,[179] the account opening document was silent as to the right of survivorship but required the account holders to affirm that they

---

[176] *See, e.g.*, *Messersmith v. Del. Tr. Co.*, 215 A.2d 721, 723 (Del. Ch. 1965) ("Certainly the language in the instruments creating the accounts which provides that 'upon the death of either, the balance then remaining in said joint account shall be the absolute property of the survivor' is at least as clear and comprehensive in effect as that relied upon by the Supreme Court in the Walsh case. Thus, no parol evidence was admissible to vary the clear meaning of the language in the instruments and legal title to the money passed to plaintiff.").

[177] *Matter of White*, 1979 WL 5969, at *1 (Del. Ch. Sept. 28, 1979) (quotation omitted).

[178] *Id.* at *3.

[179] 2000 WL 1800247 (Del. Ch. June 30, 2000).

received and read a customer agreement and "intend to be bound by the terms and conditions contained therein."[180]  In that agreement, in fine print, was the following:

> unless otherwise agreed upon in writing and subject to applicable law, if two or more persons sign the application, a joint account with right of survivorship is created, as a result of which upon the death of one customer the account balance will be paid to the survivor or survivors equally.[181]

After careful review, then-Master Glasscock found that the agreement was "intended to insulate the bank from liability, but it [is] hardly conclusive of the intent of the parties."[182]  Thus, parol evidence was admitted and, after reviewing parol evidence, then-Master Glasscock found a tenancy in common.[183]

This case is like *Matter of White* and *Speed v. Palmer*.  The PNC Account, when opened reflected the Decedent's intent that it be treated as an "Individual/sole proprietor" account; that designation was not changed when Caren's name was added.  The only documentation provided, showing Caren's addition, is silent on survivorship.  Such silence makes it far from clear and unambiguous regarding the right of survivorship.  Thus, I find parol evidence should be admitted.

---

[180] *Id.* at *4.

[181] *Id.* (quotation marks omitted).

[182] *Id.*

[183] *Id.*

I have two types of such evidence from trial: (1) the Will and (2) Caren's testimony. Caren argues that the Will supports a finding of the right of survivorship based on the following clause:

> I hereby confirm my intention that the beneficial interest in all property, real or personal, tangible or intangible (including joint checking or savings accounts in any bank, trust company or money market mutual fund), which is registered or held, at the time of my death, jointly in the names of myself and any other person with right of survivorship, but excluding any tenancy in common, shall pass by right of survivorship or operation of law outside of the terms of this Will, to such other person, if he or she survives me. To the extent that my said intention may be defeated by any rule or law or claim by my Personal Representative, I give, devise and bequeath, absolutely and in fee simple, all such jointly held property to such other person who shall survive me.[184]

But in *Pennewill v. Harris* this Court found similar language "precatory" and "simply an expression of the testator's intent that joint property with right of survivorship be so treated, free of any resulting trust that might otherwise attach to the property in favor of the estate."[185] I agree and hold the same here. Much more persuasive was Caren's own testimony that her name was put on the PNC Account "solely so [she] could assist [her] mother with her financial affairs[.]"[186]

On this record, I find the PNC Account was a convenience account with no right of survivorship. Because the PNC Account did not have a right of survivorship,

---

[184] JX7, Item III.

[185] 2011 WL 691618, *2 (Del. Ch. Feb. 4, 2011).

[186] Tr. 248:13-16.

Caren should be required to return the date-of-death value ("$110,130.07 + 1.97 accrued interest") to the estate.[187] Lynne further seeks "an order compelling Caren to convey the assets of the PNC account . . . to the [e]state . . . within thirty days of the entry of a final judgment."[188] I recommend this request be granted. Until she does so, an equitable lien should be imposed on all property owned by Caren traceable to those liquidated funds.[189]

### 2. Lynne's request to retitle beneficiary accounts should be granted.

Lynne seeks equitable relief in the form of a declaration that any beneficiary accounts be deemed probate assets, including the Lincoln Financial annuity and the Capital One Accounts. Lynne argues that retitling these accounts will better equip the estate for the judgments against Steven, ordered herein, and any future judgment against Caren, to the extent ordered and made payable from the estate. Caren appears to take no position on the request.[190]

---

[187] *See* JX47.

[188] D.I. 128, p.43.

[189] *Id.* I find the remedy of a constructive trust unavailable because, as discussed above, a constructive trust cannot be imposed over funds which do not remain in an identifiable account. *Nash v. Schock*, 1997 WL 770706, at *6.

[190] D.I. 130.

I find Lynne's request is within this Court's "broad discretion to tailor a remedy to suit the situation as it exists."[191]  It is further supported by the Will, which provides that "[t]he bequest to each child . . . shall be reduced by the amount of any indebtedness owed to [the Decedent] by such child at the time of [her] death including interest thereon[.]"[192]  For these reasons, the Capitol One Accounts, Lincoln Financial annuity, and any other accounts belonging to the Decedent which would normally pass outside the estate, should be directed to the estate.

D.  **The Decedent's personal property should be returned to the estate and costs, but not attorneys' fees, should be shifted in Lynne's favor.**

Lynne seeks an order directing Steven and Caren to turn over all property owned by the Decedent at the time of her death, or the proceeds therefrom, to the estate.  She also asks that fees and costs be shifted in her favor.  I address these requests in turn.

1.  **The Decedent's property should be provided to the estate.**

Under 12 *Del. C.* § 1901 "all goods and chattels" of the Decedent are assets of the Decedent's estate.  Lynne, as the administrator of the estate, is "managing the Decedent's assets,"[193] and "carry[ing] out the wishes of the [D]ecedent as expressed

---

[191] *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 132 A.3d 67, 121 (Del. Ch. 2015) (quoting *Gilliland v. Motorola, Inc.*, 873 A.3d 305, 312 (Del. Ch. 2005)).

[192] JX7, Item III-V.

[193] *Dixon v. Joyner*, 2014 WL 3495904, at *3 (Del. Ch. July 14, 2014).

in the [W]ill."[194]   In the Will, the Decedent bequeathed all her tangible person property (except a diamond ring) to her children—Lynne, Caren, and Steven—"in approximately equal shares[.]"[195]   If her children cannot agree on division of that personal property, Lynne, as the administrator, "shall make such division" and her decision "shall be binding upon all persons."[196]

Here, the record makes it more likely than not that both Steven and Caren had personal property belonging to the Decedent at the time of her death.[197]   But that property has not been provided to Lynne, the administrator of the estate.   This frustrates Lynne's ability to discharge her duties.   Steven and Caren should be required to return all personal property, or the proceeds therefrom, to the estate within thirty (30) days of this becoming a final order of the Court.[198]

### 2.    Bad faith fee shifting should be denied.

Lynne asks that her attorneys' fees incurred in this action be shifted to Steven and Caren.   Delaware follows the "American Rule" that "prevailing litigants are

---

[194] *In re Chambers*, 2019 WL 4110674, at *2 (Del. Ch. Aug. 29, 2019) (quotations and citations omitted).

[195] JX7, Item IV.

[196] *Id.*

[197] *See* Tr. 24:9-12, 249:10-12.

[198] *See, e.g.*, *Minieri v. Bennett*, 2013 WL 6113911, at *17 (Del. Ch. Nov. 13, 2013) (recommending that an heir be ordered to return certain personal property to an estate because the heir failed to prove the property was gifted to her before the decedent's death).

responsible for the payment of their own attorney's fees."[199] But this Court does recognize several exceptions to the American Rule and will, under the "bad faith exception," shift fees where the losing party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."[200] This is a "quite narrow exception . . . applied in only the most egregious instances of fraud or overreaching."[201]

As explained by Master Griffin in *Keen-Wik Assocation v. Campisi*, "entry of default judgment, alone, is not evidence of bad faith. Otherwise, every defaulted party would be acting in bad faith, which contravenes the higher standard set for bad faith conduct."[202] Thus, even with a default judgment, fees will not be shifted absent "clear evidence" of "subjective bad faith[.]"[203]

I start with Steven. Lynne argues Steven submitted frivolous motions and, other than attending a deposition, failed to meaningfully participate in these proceedings. Ultimately this conduct earned Steven a judgment by default. Per Lynne this is bad faith litigation because Steven "only made filings when he felt it might be beneficial to himself and other [than] that ignored court orders and failed

---

[199] *Goodrich v. E.F. Hutton Grp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996).

[200] *F. D. Rich Co. v. U. S. for Use of Indus. Lumber Co.*, 417 U.S. 116, at 129 (1974).

[201] *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997), *aff'd*, 720 A.2d 542 (Del. 1998).

[202] *Keen-Wik Ass'n v. Campisi*, 2020 WL 6162957, at *6 (Del. Ch. Oct. 19, 2020) *adopted*, (Del. Ch. 2020).

[203] *Id. See also Lawson v. State*, 91 A.3d 544, 552 (Del. 2014).

46

to appear at numerous hearings and conferences."[204] I disagree that this conduct rises to the level of subjective bad faith. Steven did not fully participate in this action and was not successful in his motion practice, but his conduct falls far short of the extreme conduct necessary to support fee shifting.[205] The request to shift fees to Steven should, thus, be denied.

Regarding Caren, I find that this request is premature. As explained above, Caren should be required to prepare a formal accounting and, only after that accounting and any exceptions thereto, will a recommendation be made on any monetary judgment against her. I find it most appropriate to address fee shifting against Caren at the conclusion of those proceedings.[206]

### 3. Costs should be awarded to Lynne as the prevailing party.

Court of Chancery Rule 54(d) provides "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." Lynne is the prevailing party in this action; although she has not succeeded on each argument, each claim was, ultimately, successful. Costs should be shifted in her favor, in an amount to be determined at the conclusion of these proceedings.

---

[204] D.I. 128, p.56.

[205] *See, e.g.*, *Williams v. Spanagel*, 2000 WL 1336728, at *8 (Del. Ch. Sept. 14, 2000), *aff'd*, 787 A.2d 101 (Del. 2001) (declining to shift fees to a defaulting party in comparable circumstances).

[206] *See Cowan v. Furlow*, 2020 WL 10965255 at *4 (Del. Ch. Dec. 15, 2020) (declining to rule on fee shifting until the conclusion of litigation).

## III. CONCLUSION

For the foregoing reasons, I find judgment should be entered against Steven in favor of the estate. I also find that Caren breached the fiduciary duties she owed to the Decedent through the sale of the Vehicle, her actions regarding the Promissory Note, and failing to maintain and disclose sufficient records. I recommend entry of judgment against Caren, and in favor of the Decedent's estate, for $2,123.58 for the insurance payments on the Vehicle. Any further judgment, I find, should await a formal accounting by Caren as specified herein.

I further find that the PNC Account was a convenience account, not a joint account with the right of survivorship. Thus, Caren should return the date-of-death value of the PNC Account to the estate within thirty days of a final order in this action.

I recommend that the Capitol One Accounts, Lincoln Financial annuity, and any other accounts belonging to the Decedent which would normally pass outside the estate, should be directed to the estate and all property of the Decedent's held by Steven and Caren be returned to the estate within thirty days of a final order in this action.

Finally, I find that fees should not be shifted regarding Steven, and it is premature to shift fees against Caren. But costs should be awarded to Lynne as the prevailing party.

48

This is my final report and exceptions may be filed under Court of Chancery

Rule 144.